## O'Connor *versus* Pittsburgh.

The city of Pittsburgh is not liable for consequential damages done to a lot of ground in the said city, and to a church thereon, by cutting down one of the streets in consequence of an alteration of its grade after the church was erected; the city, by its charter, having power to improve, repair, and keep in order the streets, and no remedy being given by Act of Assembly for such an injury.

ERROR to the District Court of *Allegheny county.*

This was an action of trespass on the case, brought by the Right Reverend Michael O'Connor, Roman Catholic Bishop of Pittsburgh, for the use of the Roman Catholic congregation of St. Paul's Church, Pittsburgh, *v.* The Mayor, Aldermen, and Citizens of Pittsburgh.

The action was brought to November Term, 1849, in the Court below, to recover damages from the city of Pittsburgh, for injuries done to the Cathedral, by cutting down Grant and Fifth streets, in that city. The bishop held the title of the property in trust for the Roman Catholic congregation of St. Paul's Church, Pittsburgh.

Remington, the city regulator, testified: "I gave the grade for St. Paul's Church in 1829. I drove a stake where they intended to place the front door. This was the grade of Fifth and Grant streets at the point of intersection, as authorized by the resolution of 1828. This was in the summer. The foundations were then sunk, except at the north-east corner. The foundation was sunk to the shale and soap-stone. I would think it a good solid foundation. The building, in my opinion, cost $25,000."

It was alleged, in one of the points reserved by the Court, that the church was built according to a grade fixed by an ordinance or resolutions of councils passed in 1828, but that the ordinance was never executed by actually grading the streets, and that the same was not recorded as required by the 6th section of the Act for the incorporation of the city.

In the year 1829, the congregation erected the Cathedral conve-

[O'Connor *v.* Pittsburgh.]

nient to and in accordance with this grade. In 1836, the councils passed an ordinance to reduce the grade ten feet at the intersection of Grant and Fifth streets, below that fixed in 1828, and to reduce the grades of these streets in such manner as to correspond with that fixed at said intersection. In 1847, they passed another ordinance to reduce said grade seven feet more, which ordinances were recorded, published, &c., and the city authorities caused the streets to be cut down to the lowest grade before mentioned.

It was alleged, on the part of the plaintiff below, that these acts destroyed the convenience and impaired the safety of the Cathedral, and induced the propriety, if not the necessity of taking it down and erecting a new one. Several witnesses expressed the opinion on the trial, that the building ought to be taken down. Some testified that the building might be protected from falling by the erection of walls on Grant and Fifth streets. Witnesses also testified, under exception, that the church property had been increased in value by the change of grade of the streets; and the Court instructed the jury that this increase of value must be deducted from the damages otherwise sustained by reason of such grade. The jury returned a verdict on two of the counts in the declaration in favor of the plaintiff, for the sum of $4000 damages; notwithstanding which LOWRIE, J., subsequently entered judgment on a reserved question *for the defendants.*

The following is the section of the Act incorporating the borough of Pittsburgh, relating to the powers of the borough to improve the streets, &c. :—

"Be it enacted, &c. That it may and shall be lawful for the town council to meet as often as occasion may require, and enact such by-laws, and make such rules, regulations, and ordinances, as shall be determined by a majority of them necessary to promote the peace, good order, benefit, and advantage of said borough, particularly of providing for the regulation of the market; improving, repairing, and keeping in order the streets, alleys, and highways; ascertaining the depth of vaults, sinks, and pits for necessary houses, and making permanent rules relative to the foundations of buildings, party-walls, and fences. They shall have power to assess and appropriate such taxes as shall be determined by a majority of them, necessary for carrying the said rules and ordinances from time to time into complete effect; and also appoint two persons to act as street and road commissioners, a clerk of the market, and a collector, annually, and such other officers as may be deemed necessary from time to time," &c. Act of 5th March, 1804, sect. 6, *Bioren's State Laws*, vol. 7, page 265.

Error was assigned, *inter alia*, to the entry of the judgment.

The case was argued by *McCandless* and *Loomis*, for the plaintiff in error.

[O'Connor v. Pittsburgh.]

*Kuhn*, for the city.

The opinion of the Court, filed November 24, 1851, was delivered by

GIBSON, C. J.—We have had this cause reargued in order to discover, if possible, some way to relieve the plaintiff consistently with law; but I grieve to say we have discovered none.  To the Commonwealth here, as to the king in England, belongs the franchise of every highway as a trustee for the public; and streets regulated and repaired by the authority of a municipal corporation, are as much highways as are rivers, railroads, canals, or public roads laid out by the authority of the quarter sessions.  In England a public road is called the king's highway; and though it is not usually called the Commonwealth's highway here, it is so in contemplation of law, for it exists only by force of the Commonwealth's authority.  Every railroad, canal, turnpike, or bridge company, has its franchise by grant from the state, and consequently with its original qualities and immunities adhering to it. Every highway, toll or free, is licensed, constructed, and regulated by the immediate or delegated action of the sovereign power; and in every Commonwealth the people in the aggregate constitute the sovereign.  But it is the prerogative of a sovereign to be exempt from coercion by action; for jurisdiction implies superiority, and a sovereign can have no superior.  At the declaration of American independence, prerogatives which did not concern the person, state, and dignity of the king, but such as had been held by him in trust for his subjects, were assumed by the people here and exercised immediately by themselves; among the rest, unwisely I think, the prerogative of refusing to do justice on compulsion. That a suit cannot be maintained against the state without its consent, is shown by the statute which enabled Pennsylvania claimants to sue the state for the value of lands ceded to Connecticut claimants within the seventeen townships in Luzerne county. But this prerogative would be unavailing if it could not protect the agents whom the Commonwealth has necessarily to employ. It was applied to the protection of a private corporation in the Monongahela Navigation *v.* Coons, and Henry *v.* The Allegheny Bridge; in which it was held that a chartered company to improve the navigation of a public highway, or to build a bridge, is not answerable for consequential damages; and it was applied to the protection of a municipal corporation in Green *v.* The Borough of Reading; The Mayor *v.* Randolph, and the Philadelphia and Trenton Railroad; to which may be added every decision on the subject in our sister states, except the decisions in Ohio, which, however founded in natural justice, are not founded in the law which prevails elsewhere.

Yet it must be admitted that, while it is inequitable to injure

[O'Connor *v.* Pittsburgh.]

the property of an individual for the benefit of the many, it would be impossible for a corporation to bear the pressure of successive common law actions for the continuance of a nuisance, each verdict being more severe than the preceding one. The modification of the remedy would be for the legislature, which can turn compensation for a permanent detriment into the price of a prospective license; but to attain complete justice, every damage to private property ought to be compensated by the state or corporation that occasioned it, and a general statutory remedy ought to be provided to assess the value. The constitutional provision for the case of private property *taken* for public use, extends not to the case of property *injured* or *destroyed;* but it follows not that the omission may not be supplied by ordinary legislation. No property was taken in this instance; but the cutting down of the street consequent on the reduction of its grade, left the building useless, and the ground on which it stood worth no more than the expense of sinking the surface of it to the common level. The loss to the congregation is a total one, while the gain to holders of property in the neighborhood, is immense. The legislature that incorporated the city, never dreamt that it was laying the foundation of such injustice; but, as the charter stands, it is unavoidable.

Judgment affirmed.