388 A.2d 709

**Jimmy V. MAYLE, Appellant,**

**v.**

**PENNSYLVANIA DEPARTMENT OF HIGHWAYS.**

Supreme Court of Pennsylvania.

Argued March 6, 1978.

Decided July 14, 1978.

Rehearing Denied and Dissenting Opinion Aug. 31, 1978.

See 390 A.2d 181.

William M. Panella, New Castle, for appellant.

Richard S. Herskovitz, Asst. Atty. Gen., Dept. of Transportation, Harrisburg, for appellee.

Before EAGEN, C. J., and O'BRIEN, ROBERTS, POM-
EROY, NIX, MANDERINO and LARSEN, JJ.

## OPINION OF THE COURT

ROBERTS, Justice.

Appellant Jimmy Mayle brought an action in trespass
against appellee Pennsylvania Department of Highways in
the Commonwealth Court for damages incurred as a result
of injuries allegedly caused by appellee's negligent mainte-
nance of Legislative Route 79, a public highway. Appellee
asserted that the "sovereign immunity" of the Common-
wealth prohibited any court in the Commonwealth from
hearing the suit. The Commonwealth Court dismissed the
complaint. We reverse.[1]

The question before us is whether the Commonwealth is
immune from tort liability except where a legislative act
expressly or implicitly authorizes suit. This rule of "sover-
eign immunity" has been recently upheld by this Court.[2]
We today abrogate this doctrine of "sovereign immunity."
We conclude that the doctrine is unfair and unsuited to the
times and that this Court has power to abolish the doctrine.

### I

Whatever justification ever existed for the doctrine that
the Commonwealth is immune from liability for tortious
conduct unless the Legislature has consented to suit, the
doctrine's day has long since passed. Under the doctrine,
plaintiff's opportunity for justice depends, irrationally, not
upon the nature of his injury or of the act which caused it,
but upon the identity or status of the wrongdoer. Three
times in recent years we have repudiated as unfair similar

1. We hear this appeal pursuant to the Appellate Court Jurisdiction
 Act of 1970, Act of July 31, 1970, P.L. 673, art. II, § 203, 17 P.S.
 § 211.203 (Supp.1978).

2. E. g., *Freach v. Commonwealth*, 471 Pa. 558, 370 A.2d 1163 (1977)
 (Roberts, Nix and Manderino, JJ., dissenting); *Brown v. Common-
 wealth*, 453 Pa. 566, 305 A.2d 868 (1973) (Roberts, Nix and Manderi-
 no, JJ., dissenting).

status-based immunities of parties.[3] A majority of the states has rejected sovereign immunity at least to some degree,[4] and commentators oppose it nearly unanimously.[5]

The most popular theory of the origin of sovereign immunity of the American states is that it is a carryover from the English doctrine that "the King can do no wrong." Although this maxim may originally have been a misstatement of the early English law, by the time of Henry III (mid-13th Century), it was settled feudal law that the King could not be sued in his own courts without his consent.[6] By the mid

3. *Ayala v. Philadelphia Board of Public Educ.*, 453 Pa. 584, 305 A.2d 877 (1973) (local government immunity); *Falco v. Pados*, 444 Pa. 372, 282 A.2d 351 (1971) (parental immunity); *Flagiello v. Pennsylvania Hospital,* 417 Pa. 486, 208 A.2d 193 (1965) (immunity of charities).

4. Professor Davis collects and analyzes cases demonstrating that 31 states have at least partially abolished sovereign immunity by judicial action. K.C. Davis, Administrative Law of the Seventies § 25.00 (1976 & Supp.1977); K.C. Davis, Administrative Law Treatise § 25.00 (1970 bound supplement); 3 id. § 25.01 (1958). Chapter 25 of all three sources also analyzes state and federal statutes fully or partially abolishing sovereign immunity. Later cases limiting or abolishing the doctrine include *Oroz v. Board of County Commissioners,* 575 P.2d 1155 (Wyo.1978); *Jones v. State Highway Comm'n,* 557 S.W.2d 225 (Mo.1977). Id. at 227 n.1 lists 29 states judicially abolishing or modifying sovereign immunity.

5. The most massive criticism is Borchard, Government Liability in Tort (I–VIII), 34 Yale L.J. 1, 129, 229 (1924), 36 Yale L.J. 1, 757, 1039 (1926), 28 Colum.L.Rev. 577, 734 (1928). Other prominent critics of sovereign immunity include Davis, supra note 4; Prosser, Torts § 131 at 970–987 (4th ed. 1971); Van Alstyne, Governmental Tort Liability: A Decade of Change, 1966 U.Ill.L.F. 919. Dean Prosser notes that "In all of the states . . . consent [to suit] has been given, to a greater or lesser extent." Prosser, supra at 975. Recent Pennsylvania criticism includes Sloan, Lessons in Constitutional Interpretation: Sovereign Immunity in Pennsylvania, 82 Dick.L.Rev. 209 (1978).

6. C. E. Jacobs, The Eleventh Amendment & Sovereign Immunity 5 (1972). James suggests this immunity is demonstrable only back to the time of Edward I (late 13th cent.). James, Tort Liability of Governmental Units and Their Officers, 22 U.Chi.L.Rev. 610, 611 & n.5 (1955).

 The maxim may originally have meant that the King was not privileged to do wrong. See Borchard, Government Liability in Tort, I, 34 Yale L.J. 1, 2 (1924); *Biello v. Pennsylvania Liquor Control Board,* 454 Pa. 179, 187–88 n.2, 301 A.2d 849, 853 n.2 (1973) (Nix, J., joined by Roberts, J., dissenting).

eighteenth century, the doctrine that the crown, as the embodiment of the modern state, could not be sued without its consent had become part of the Blackstonian canon.[7] The first case in Pennsylvania adopting sovereign immunity asserted that the immunity of American states is an attribute to the English crown which the states took on themselves at independence, but which they might better have left behind with King George:

"At the declaration of American independence prerogatives which did not concern the person, state, and dignity of the King, but such as had been held by him in trust for his subjects, were assumed by the people here and exercised immediately by themselves; among the rest, unwisely I think, the prerogative refusing to do justice on compulsion."[8]

7. 3 Blackstone, Commentaries *254–55; see 1 id. *240–42 (the King as the embodiment of the state). Yet, even Blackstone admitted that the crown would, as a matter of course, permit itself to be sued. 3 id. *255. He devoted a chapter to remedies for wrongs done by the crown. 3 id. ch. 17. See also L. Jaffe, Judicial Control of Administrative Action 197–99 (1965). It was not until 1865 that it was decided that the "petition of right," which was the form for suit against the crown, would not be used against the crown to redress the torts of its servants. Id. at 203, citing Feather v. The Queen, 6 B. & S. 257, 295, 122 Eng.Rep. 1191, 1205 (Q.B.1865) (applying "the maxim that the King can do no wrong").

8. O'Connor v. Pittsburgh, 18 Pa. 187, 189 (1851) (Gibson, C. J.). Even earlier, this Court had commented upon the necessity of the procedure allowing contract claims to be brought against the Commonwealth. Hutchinson v. Commonwealth, 6 Pa. 124, 127–28 (1847).

In O'Connor, the Court held that municipalities were parts of the Commonwealth. In the hundred and twenty years following O'Connor, the immunities of local governments and of the Commonwealth were seen as having a common source, whether that single source be common law, see Morris v. Mt. Lebanon Twp. School Dist., 393 Pa. 633, 144 A.2d 737 (1958); Brewer v. Commonwealth, 345 Pa. 144, 27 A.2d 53 (1942); Heil v. Allegheny County, 330 Pa. 449, 453, 199 A. 341, 343 (1938); Ford v. Kendall Borough School District, 121 Pa. 543, 15 A. 812 (1888); City of Philadelphia v. Gilmartin, 71 Pa. 140 (1872); or constitutional, see Smeltz v. City of Harrisburg, 440 Pa. 224, 269 A.2d 466 (1970); Laughner v. Allegheny County, 436 Pa. 572, 261 A.2d 607 (1970). See generally section II infra (on the common-law origins of sovereign immunity). The doctrines of sovereign and governmental immunity were not severed until Brown v.

Thus, in Pennsylvania, the doctrine of sovereign immunity was criticized at its very inception as an unwise remnant of English political theory. As the Supreme Court of Illinois stated:

> "in preserving the sovereign immunity theory, courts have overlooked the fact that the Revolutionary War was fought to abolish that 'divine right of Kings' on which the theory is based." [9]

Moreover, the immunity accorded Pennsylvania as "sovereign" has been far greater than that claimed by any English king or queen at least since the restoration of the monarchy in 1660. Since that time, the crown has been subject to suit in equity in the Court of Exchequer for "it would derogate from the King's honour to imagine that what is equity against a common person should not be equity against

*Commonwealth*, supra note 2, and *Ayala v. Philadelphia Board of Public Education*, supra note 3, companion cases decided in 1973. Thus, for most of the history of the Commonwealth, cases involving immunity of local governments are both relevant and necessary to understanding the development of sovereign immunity.

One earlier case denied a plaintiff the opportunity to make a full counter-claim against the Commonwealth in court and referred him for relief to the Senate. This case, however, was at nisi prius (trial term) at a time when this Court was not the highest tribunal in Pennsylvania, see infra, and referral to the Senate may have been based not on immunity of the Commonwealth but on the fact that the counter-claimant was an employee of the Senate, claiming money the Senate allegedly owed. *Commonwealth v. Matlack*, 4 Dall. (4 U.S.) 303, 1 L.Ed. 843 (Pa.Supreme 1804). Matlack won a verdict of set-off of the amount of the Commonwealth's claim against him. Id. (The report of this case is not verbatim and one Dallas is named as attorney for Matlack).

It should be noted that between 1780 and 1806, the Supreme Court of Pennsylvania was inferior to the High Court of Errors and Appeals of Pennsylvania. Act of February 28, 1780, chap. DCCCLXVIII, noted in 2 Laws of Pa. at 239 (1803 reprint) (text not printed in either 1803 edition or in Sm.L.), amended by Act of April 13, 1791, Chap. MDLXIV, §§ 16, 17, 19, 22, 3 Sm.L. 28, 32, 35 (1810 reprint), repealed by Act of February 24, 1806, Chap. MMDCXXXIV, § 11, 4 Sm.L. 270, 272–73 (1810 reprint). We have found no decisions of that tribunal bearing on sovereign immunity.

**9.** *Molitor v. Kaneland Community Unit District No. 302*, 18 Ill.2d 11, 22, 163 N.E.2d 89, 94 (1959) (relying upon without citing the Supreme Court of Florida).

him." [10] Nonetheless, in Pennsylvania, the immunity of the Commonwealth grew to include suits in equity [11] and petitions for declaratory judgment [12] as well as actions at law. No explanation was ever offered for this extension of the doctrine and the English history of the doctrine does not support it.

A second reason offered for the growth of sovereign immunity is that without such a doctrine many, if not most, of the states would have gone bankrupt soon after the American Revolution. While it is true that many states would have faced bankruptcy during that period without insulation from suit on obligations, [13] Pennsylvania constantly allowed claims against it to be made in the office of the

**10.** *Pawlett v. Attorney General*, Hadres 465, 469, 145 Eng.Rep. 550, 552 (Exchequer 1668) (Atkyns, B.). Accord, *Dyson v. Attorney General*, [1912] 1 K.B. 410, 415, as cited in *Biello v. Pennsylvania Liquor Control Board*, 454 Pa. at 188 n. 4, 301 A.2d at 853 n. 4 (Nix, J., joined by Roberts, J., dissenting). *Pawlett* is often seen as strong authority for the existence of a full set of equitable remedies against the King. E. g., *Biello*, supra. This may be a slight overstatement. Hale, C. B., stated "the King is in actual possession [of the land in question] and cannot be removed in equity by an amoveas manum, [lit. "that you remove your hands," Black's L.Dict. 109], as he may at law. Hadres at 469, 145 Eng.Rep. at 552. It is not clear whether Baron Hale would have considered the equitable remedy unavailable had he not believed the plaintiff had a remedy at law.

The petition of right against the monarch had been available in certain cases since Edward I. Jaffe, Suits against Governments and Officers: Sovereign Immunity, 77 Harv.L.Rev. 1, 5, 6 (1963).

**11.** *Philadelphia Life Ins. Co. v. Commonwealth*, 410 Pa. 571, 190 A.2d 111 (1963); *Williamsport & Elmira R. Co. v. Commonwealth*, 33 Pa. 288 (1859).

**12.** Compare *Bell Telephone Co. v. Lewis*, 313 Pa. 374, 169 A. 571 (1934) (alternate holding) (petition for declaratory judgment could not be brought against sovereign), with *Dyson v. Attorney General*, [1911] 1 K.B. 410 (contra) (as cited in L. Jaffe, supra note 7, at 202 n. 12).

**13.** *Chisholm v. Georgia*, 2 Dall. (2 U.S.) 419, 1 L.Ed. 440 (1793), holding that federal courts had jurisdiction over a suit against Georgia by citizens of other states, caused almost immediate passage of the eleventh amendment, depriving the United States courts of such jurisdiction. See D. Currie, Federal Courts 559–61 (2d ed. 1975) (citing sources debating extent of threat of state bankruptcy after the Revolution).

Comptroller General for "services performed, monies advanced, or articles furnished by order of the legislature," [14] with a right of appeal to the Supreme Court of Pennsylvania.[15] Indeed, the Pennsylvania Legislature failed to approve a resolution calling for a constitutional amendment which would shield the states from suits on their obligations in federal court, and when this amendment was proposed by Congress, Pennsylvania refused to ratify it.[16] Further, before adoption of the Constitution of the United States, Pennsylvania had paid interest on certificates issued to former soldiers by the Continental Congress and, after a bitter public controversy, assumed over $5,000,000 of the national debt.[17] Pennsylvania did not feel the need, as certain other states did, to protect itself from liability through sovereign immunity.

Two cases in this Court from the Post-Revolutionary period, *Respublica v. Sparhawk*,[18] and *Black v. Rempublicam*,[19] are nonetheless read by some as adopting the doctrine of sovereign immunity.[20] In *Sparhawk*, the plaintiff sought to recover from the Comptroller General the value of goods seized during the Revolution by agents of the Commonwealth, acting upon direction of the Continental Congress. The goods had been seized to prevent them from falling into the hands of the British, but the enemy captured and used them anyway.

**14.** Act of April 13, 1782, Chap. DCCCCLIX § 1, 2 Sm.L. 19 (1810 reprint).

**15.** *Respublica v. Sparhawk*, 1 Dall. (1 U.S.) 357, 363, 1 L.Ed. 174 (Pa.Supreme 1788) (McKean, C. J.).

**16.** C. E. Jacobs, The Eleventh Amendment & Sovereign Immunity 65–67 & n. 99 (1972).

**17.** M. Jensen, The New Nation 389, 393–96 (1950).

**18.** Supra note 15.

**19.** 1 Yeates 140 (Pa.Supreme 1792).

**20.** The first judicial citation of either of these cases for this proposition occurs in *Collins v. Commonwealth*, 262 Pa. 572, 575, 106 A. 229, 230–31 (1919).

On appeal, this Court [21] stated that "[t]he transaction . . . happened flagrante bello; and many things are lawful in that season, which would not be permitted in a. time of peace." Far from stating that the sovereign can do no wrong, the Court stated that the original taking by the Commonwealth would have been a trespass in time of peace.[22]

The Court then stated a rule which has occasionally been used to justify sovereign immunity: "[I]t is better to suffer a private mischief, than a public inconvenience . . . ." [23] "Public inconvenience" has sometimes been interpreted as the demand on the public purse made by tort victims.[24] However, the examples of inconveniences the public may avoid without liability which the Court cited in denying Sparhawk's claim do not demonstrate public immunity for torts, but merely show that in exigent circumstances, the public may use private property.[25] Thus this maxim was interpreted in Pennsylvania not as a limitation of the liability of government for tortious conduct, but as a limitation on the private interest a citizen could claim in land and chattels against either other citizens or the government.[26]

This Court held in the alternative that the Comptroller General had no jurisdiction to hear Sparhawk's claim be-

21. See note 8 supra.

22. 1 Dall. (1 U.S.) at 362.

23. Id.

24. See *Ayala v. Philadelphia Board of Public Educ.*, 453 Pa. 584, 593, 305 A.2d 877, 881 (1973), citing *Russell v. Men of Devon*, 2 T.R. 667, 673, 100 Eng.Rep. 359, 362 (K.B.1788) (Ashhurst, J.) (same year as *Sparhawk*).

25. For example, in 1788, members of the public had a right of way to tow barges along privately owned river banks (when river traffic would be impeded otherwise), and a house could be razed to contain a fire. 1 Dall. (1 U.S.) at 363 (Pa.Supreme).

26. By contrast, *Russell v. Men of Devon*, 2 T.R. at 673, 100 Eng.Rep. at 362 (Ashhurst, J.), used the slogan as a limit on government tort liability.

cause the claim was not for "services performed, monies advanced, or articles furnished." [27] Despite the Commonwealth's direct assertion that it was an immune sovereign,[28] the Court refused to hold that if the Commonwealth's taking had been a trespass committed in peacetime, no court would have had jurisdiction to hear the claim absent consent of the Legislature.

In *Black v. Rempublicam*,[29] another Revolutionary War case, the plaintiff attempted to demonstrate his goods were taken under a contract with agents of the state. Failing that, his claim was dismissed on the same jurisdictional ground. Once again, this Court declined to treat the Commonwealth as an immune sovereign, and did not discuss the Commonwealth's argument that subjecting it to Revolutionary War claims would bankrupt it.[30] Thus, fear of bankruptcy did not compel the adoption of sovereign immunity in post-Revolutionary Pennsylvania.[31]

The eighteenth century also gave birth to the argument that liability of the government for torts of its agents would result in "an infinity of actions." [32] But as early as 1851, this Court recognized that a properly formulated jurisdictional scheme could provide orderly and adequate compensa-

**27.** Supra note 14.

**28.** 1 Dall. (1 U.S.) at 360 (argument for the Commonwealth), citing 1 Blackstone's Commentaries * 242.

**29.** 1 Yeates 140 (Pa.Supreme 1792).

**30.** Id. at 142.

**31.** In *Ford v. Kendall Borough School District*, 121 Pa. 543, 548–49, 15 A. 812, 815 (1888), this Court expressed concern that liability for personal injury caused by torts of their agents would threaten the financial stability of "weak and poor" school districts, although we had previously suggested that all state and local governments ought to be liable for all injuries to private property. *O'Connor v. Pittsburgh*, 18 Pa. 187, 190 (1851).

**32.** *Russell v. Men of Devon*, 2 T.R. at 671, 100 Eng.Rep. at 362 (Ld. Kenyon, C. J.).

tion for "every damage to private property . . . by the state or [municipal] corporation that occasioned it." [33]

The Commonwealth now argues both that tort liability could overburden the courts and either bankrupt the Commonwealth or endanger its financial stability.[34] Significantly, however, the Commonwealth has shown no evidence that tort liability of a government or a public authority has ever resulted in either undue clogging of the courts or destabilization of government finances. Indeed, the Commonwealth admits it does not know what, if anything, will happen to court dockets and public finances if the immunity of the Commonwealth from tort liability is abolished.[35] This sort of speculation cannot support a doctrine so "plainly unjust . . . to persons injured by the wrongful conduct of the State [and which] [n]o one seems to defend . . . as fair." [36]

If anything, the information before us suggests that making governments liable for their torts will not substantially raise the costs of government or upset governmental financial stability.[37] Certainly, the greatest threats to the finan-

33. *O'Connor v. Pittsburgh*, 18 Pa. at 190. This request for legislative action has been echoed many times since. E. g., *Morris v. Mt. Lebanon Twp. Sch. Dist.*, 393 Pa. 633, 144 A.2d 737 (1958).

34. In the related cases of *DuBree v. Commonwealth*, (J. 52 (1978)); *Brungard v. Hartman*, (J. 53 (1978)), and *Garrettson v. Commonwealth*, (1978) 479 Pa. 416, 388 A.2d 724 the Commonwealth argues that a particularly significant burden would fall upon the Commonwealth Court, which has original jurisdiction over actions against the Commonwealth. See 17 P.S. § 211.401.

35. Supplemental Brief for Commonwealth Appellee in *DuBree v. Commonwealth, Brungard v. Hartman*, and *Garrettson v. Commonwealth*, supra at 6.

36. *Willis v. Department of Conservation and Economic Development*, 55 N.J. 534, 537, 264 A.2d 34, 36 (1970).

37. See David, Tort Liability of Local Government: Alternatives to Immunity from Suit or Liability, 6 U.C.L.A.L.Rev. 1, 6–17 (1959); P. G. Brown, Personal Liability of Public Officials, Sovereign Immunity, & Compensation for Loss 13–14 (Acad. for Contemp. Probs.—Law & Ethics Series No. 1, 1977). Brown indicates that tort liability is not today a major financial burden upon government or its officers, but

cial stability of state and local governments in recent years have not concerned tort liability, but limitations on taxing authority [38] and liability on contractual obligations such as bonds [39] and labor agreements.[40] Further, because negligence involves the reasonableness of the actor's conduct, unreasonably expensive protective measures will not be required of governments any more than they are required of private parties.[41] Welfare economics analysis suggests that government, if suable in tort, may become more efficient, although this improvement may not appear on its balance sheets as added assets or reduced liabilities.[42]

We recently rejected the government-bankruptcy and flood-of-litigation arguments when we abolished local governmental immunity:

"We must also reject the fear of excessive litigation as a justification for the immunity doctrine. Empirically, there is little support for the concern that the courts will be flooded with litigation if the doctrine is abandoned. '. . . [M]ore compelling than an academic debate over the apparent or real increases in the amount of litigation, is the fundamental concept of our judicial system that any such increase should not be determinative or relevant to the availability of a judicial forum for the adjudication of impartial individual rights. "It is the business of the law to remedy wrongs that deserve it, even

does not analyze the burden depending upon the scope of substantive liability to which each jurisdiction is exposed.

**38.** See Proposition 13, California Primary Election, 1978 (proposal to limit taxing authority of state).

**39.** See, e. g., *United States Trust Co. v. New Jersey*, 431 U.S. 1, 97 S.Ct. 1505, 52 L.Ed.2d 92 (1977).

**40.** See, e. g., *Subway-Surface Supervisors Ass'n v. New York City Transit Auth.*, 85 Misc.2d 695, 381 N.Y.S.2d 186 (Sup.Ct.1976); Comment, Constitutionality of the New York Municipal Wage Freeze and Debt Moritorium, 125 U.Pa.L.Rev. 167 (1976).

**41.** See Brown, supra note 37.

**42.** See Note, Economic Analysis of Sovereign Immunity in Tort, 50 S.Cal.L.Rev. 515 (1977).

at the expense of a 'flood of litigation'; and it is a pitiful confession of incompetence on the part of any court of justice to deny relief upon the ground that it will give the courts too much work to do." Prosser, Intentional Infliction of Mental Suffering: A New Tort, 37 Mich.L.Rev. 874 (1939). We obviously do not accept the "too much work to do" rationale. We place the responsibility exactly where it should be: not in denying relief to those who have been injured, *but on* the judicial machinery of the Commonwealth to fulfill its obligation to make itself available to litigants.' " [43]

In rejecting the financial burden argument in the context of local government immunity, we noted we had rejected

"the [financial burden] argument as it applied to the immunity of charitable institutions, [saying]: 'The voluminous arguments advanced by the defendant hospital and the amicus curiae, on the subject of the financial problems of hospitals today, are, while interesting and enlightening, wholly irrelevant to the issue before us. We have a duty to perform and that is to see that justice, within the framework of law, is done. Our function is to decide cases as they come before us on the pertinent facts and law. What could happen in the event the plaintiff obtains a verdict is not an issue here. The pleadings in this litigation require that we decide whether the defendant hospital should answer the charges brought against it by the plaintiff.' " [44]

The financial burden argument is no more compelling now than it was in 1790, and no more so in the context of State government than in the context of local governments or charities. We continue to reject it.

**43.** *Ayala v. Philadelphia Board of Public Educ.*, 453 Pa. at 595, 305 A.2d at 882, quoting *Niederman v. Brodsky*, 436 Pa. 401, 412, 261 A.2d 84, 89 (1970), and citing David, supra note 37, and Fuller and Casner, Municipal Tort Liability in Operation, 54 Harv.L.Rev. 437, 469 (1941).

**44.** *Ayala*, 453 Pa. at 597, 305 A.2d at 883, quoting *Flagiello v. Pennsylvania Hospital*, 417 Pa. 486, 503–04, 208 A.2d 193, 202 (1965).

Nonliability of governments for the torts of their agents may have arisen because courts were reluctant to use the doctrine of respondeat superior or to attribute the misdeeds of officers to the sovereign.[45] Eighteenth and nineteenth century English and Pennsylvania cases reflect this concern. In *Elliott v. Philadelphia*,[46] this Court stated:

" 'It is not conceivable,' says Kennedy, J., 'how any blame can be fastened upon a municipal corporation because its officer, who is appointed or elected, for the purpose of causing to be observed and carried into effect the ordinances duly passed by the corporation for its police, either mistakenly or willfully, under color of his office, commits a trespass; for in such a case it cannot be said that the officer acts under any authority given to him, either directly or indirectly, by the corporation, but must be regarded as having done the trespass of his own will . . . . It is like the familiar case of master and servant; where the latter wilfully does an act without the consent or authority of the master, by which a third person is injured, the servant alone is answerable.' " [47]

Negligent performance of an act within the scope of the agent's duties was at the time of *Elliott* attributable to any private corporate master.[48] Thus the analogy drawn in *Elliott* between nonliabilities of municipal and private corporations for acts of their agents was not applicable; the Court was simply unwilling to apply the doctrine of respon-

45. See *Ayala v. Philadelphia Board of Public Educ.*, 453 Pa. at 589–90, 305 A.2d at 879–80.

46. 75 Pa. 347, 348–49 (1874).

47. Id., quoting *Fox v. The Northern Liabilities*, 3 Watts & S. 103, 106 (1842) (alternate holding); accord, *Feather v. The Queen*, 6 B. & S. 257, 295–96, 122 Eng.Rep. 1191, 1205 (Q.B.1865).

48. 75 Pa. at 349. Thus, failure to apply respondeat superior to government in Pennsylvania was not, as Jaffe, supra note 7 at 232–33, asserts, due to a general unwillingness to accept respondeat superior at all.

deat superior to most governmental and public authorities.[49] Any justification for this attitude has of course long since disappeared,[50] and the attitude itself was crumbling as early as 1888.[51] Thus, this basis for Commonwealth immunity from tort liability is invalid today.

Finally, it was formerly asserted, both in Pennsylvania and elsewhere, that government should not be liable for its torts in the absence of legislative consent to suit because otherwise there is "no fund out of which [a government] can pay damages resulting from [its] own misconduct or that of [its] officers."[52] We recently rejected this argument as an archaic and inadequate conceptualization of the reasons for which general appropriations of public funds are made:

"[The argument has been advanced] that immunity is required because governmental units lack funds from which claims could be paid. It is argued that funds would be diverted to the payment of claims and the performance of proper governmental functions would be obstructed. Initially, we note our disagreement with the assumption that the payment of claims is not a proper governmental function. 'As many writers have pointed out, the fallacy in [the no-fund theory] is that it assumes the very point which is sought to be proved, i. e., that payment of damage claims is not a proper purpose.' ".[53]

49. Accord, *Ford v. Kendall Borough School District*, 121 Pa. 543, 549–50, 15 A. 812, 816 (1888) (refusing to apply respondeat superior to school districts because they are agents of the Commonwealth); *School District v. Fuess*, 98 Pa. 600 (1881) (same); see *Black v. Rempublicam*, 1 Yeates 140, 142 (1792) (perceived impossibility that agents of Commonwealth could authorize seizure of goods in New Jersey).

50. *Ayala v. Philadelphia Board of Public Educ.*, supra note 3.

51. *Ford v. Kendall Borough School District*, 121 Pa. at 549–50, 15 A. at 816.

52. Id. 121 Pa. at 548, 15 A. at 815; accord, *Russell v. Men of Devon*, 2 T.R. at 672–73, 100 Eng.Rep. at 362 (Ld. Kenyon, C. J.).

53. *Ayala v. Philadelphia Board of Public Educ.*, 453 Pa. at 596, 305 A.2d at 883, quoting *Molitor v. Kaneland Community Unit District No. 302*, 18 Ill.2d at 22, 163 N.E.2d at 94.

Thus, all the historic arguments made for sovereign immunity either have never been accepted in Pennsylvania or reflect obsolete legal thinking. None has continuing vitality.

## II

The argument the Commonwealth advances most vigorously is that article I, section 11, of the Constitution of Pennsylvania deprives any court of jurisdiction to hear a case brought against the Commonwealth absent an act of the Legislature permitting the suit. This section reads:

> "All courts shall be open; and every man for an injury done him in his lands, goods, person or reputation shall have remedy by due course of law, and right and justice administered without sale, denial or delay. Suits may be brought against the Commonwealth in such manner, in such courts and in such cases as the Legislature may by law direct."

This section first entered the Pennsylvania Constitution in 1790,[54] and was adopted verbatim in the Constitutions of 1838 [55] and 1873,[56] all three times as part of the Declaration of Rights. Despite recent cases in which a majority of this Court accepted the Commonwealth's interpretation of article I, section 11, as the sole reason for retaining the rule of sovereign immunity,[57] we now believe that this constitutional provision does not forbid judicial abrogation of the doctrine. Rather,

**54.** Pa.Const. of 1790, art. IX, § 11.

**55.** Pa.Const. of 1838, art. IX, § 11.

**56.** Pa.Const. of 1873, art. I, § 11.

**57.** *Freach v. Commonwealth,* 471 Pa. 558, 370 A.2d 1163 (1977); *Zerby v. Department of Transportation,* 464 Pa. 421, 346 A.2d 914 (1975); *Williams v. Commonwealth,* 460 Pa. 581, 333 A.2d 924 (1975); *Sweigard v. Pennsylvania Dep't of Transportation,* 454 Pa. 32, 309 A.2d 374 (1973); *Biello v. Pennsylvania Liquor Control Board,* 454 Pa. 179, 301 A.2d 849 (1973); *Brown v. Commonwealth,* 453 Pa. 566, 305 A.2d 868 (1973); *Meagher v. Commonwealth,* 439 Pa. 532, 266 A.2d 684 (1970)

"The Constitution is . . . neutral—it neither requires nor prohibits sovereign immunity. It merely provides that the presence or absence of sovereign immunity shall be decided in a non-constitutional manner. . . . *The [Commonwealth's argument] mistakenly concludes that since the framers recognized the need for resolution of these issues they thereby mandated the doctrine itself. . . . [I]t is an unwarranted conclusion to assume from the grant of the power of consent [to suit] to the legislative branch that this was implicitly an abrogation of the court's traditional powers to abolish common law principles when they no longer meet the needs of the time.*" [58]

The history of the adoption of this section indicates that the Framers of 1790 intended to allow the Legislature, if it desired, to choose cases in which the Commonwealth should be immune, but did not intend to grant constitutional immunity to the Commonwealth.

As section I, supra, establishes, Revolutionary and post-Revolutionary Pennsylvania was hostile to the notion that the Commonwealth should have the prerogatives of the English crown or that it should be immune from paying its just debts.[59] For example, in 1782, before the end of the Revolutionary War, the Legislature passed a statute allowing all contract and bond claims against the Commonwealth to be presented for adjudication.[60] Likewise, in the 1788 case of *Respublica v. Sparhawk*,[61] this Court agreed that the plaintiffs' allegations would have alleged a trespass had the Commonwealth not been acting in wartime to keep goods out of the hands of the enemy.

---

**58.** *Biello v. Pennsylvania Liquor Control Board,* 454 Pa. at 189, 301 A.2d at 854 (Nix, J., joined by Roberts, J., dissenting) (text varies in A.2d); see Jacobs, The Eleventh Amendment and Sovereign Immunity, 25 & n. 53 (1972).

**59.** See notes 13–31 supra & accompanying text.

**60.** See notes 14 & 15 supra & accompanying text.

**61.** See notes 18–28 supra & accompanying text.

Article IX, section 11 of the Pennsylvania Constitution was originally proposed to the 1790 Convention in the following form:

"That all courts shall be open, and every [free]man, for an injury done him in his lands, goods, person, or reputation, shall have remedy by the due course of [the] law, and right and justice administered [to him,] without denial, or delay." [62]

James Wilson, a known opponent of sovereign immunity,[63] persuaded the Convention to add the following sentence:

"Suits may be brought against the Commonwealth as well as against other bodies corporate and individual." [64]

This section, subjecting the Commonwealth to suit in all cases in which private parties could be sued, would constitutionally have abolished sovereign immunity and precluded the Commonwealth's liability. Shortly after this section was approved, however, a motion was made to reconsider, and the convention substituted the following:

"Suits may be brought against the Commonwealth in such manner, in such courts and in such cases as the legislature shall, by law direct." [65]

**62.** Francis Shunk, Minutes of the Convention that Formed the Present Constitution of Pennsylvania 223 (1825). James Wilson successfully urged the Convention to change "freeman" to "man." Id., 223, 261.

**63.** At the Pennsylvania convention which ratified the Federal Constitution, Wilson asserted that Article III of the Federal Constitution of 1787 made states liable to suit by citizens of other states, 2 Elliot's Debates in the Several States on the Adoption of the Federal Constitution 491 (1907), and later acted on this belief as a member of the United States Supreme Court majority in *Chisholm v. Georgia,* 2 Dall. (2 U.S.) 419, 453–66 (1793).

Wilson was one of the most influential members of the 1787 convention which drafted the Constitution of the United States, and one of the leading legal scholars of his day. L. Levy, Legacy of Suppression 201 (1966). He also became the first person to teach law at an American university by giving a series of law lectures at the University of Pennsylvania shortly before his appointment to the United States Supreme Court.

**64.** Shunk, supra note 62, at 282.

**65.** Id. 291–92.

Thus, although no debate concerning any of the versions has been preserved, it appears that the 1790 Convention adopted this section in that form to preserve for the Legislature the opportunity, denied by Wilson's amendment, to make Pennsylvania immune in certain cases. There is no evidence that this sentence was added to make sovereign immunity the constitutional rule unless the Legislature decides otherwise. Indeed, one would not expect such evidence to exist in 1790 in a state with such a strong history of opposition to this privilege of the crown.

Three years after the adoption of the Pennsylvania Constitution of 1790, the United States Supreme Court, in *Chisholm v. Georgia*,[66] announced that states would be subject in federal court to suits on their obligations by citizens of other states. The Court gave no indication that the states would not also be subject to suit for their torts. Nonetheless, the Legislature refused both to recommend a constitutional amendment to deprive federal courts of this jurisdiction and to ratify the eleventh amendment when proposed by Congress.[67] Had the Pennsylvania Legislature of the 1790's seen immunity of the state, absent its consent, as an integral part of the Constitution of the Commonwealth, it surely would have opposed destruction of that doctrine in the federal courts.

Further, the judicial history of sovereign immunity indicates that it

"has a judicial origin and has been judicially modified. The constitutional basis for this doctrine has been a more recent judicial construction. When other grounds have

**66.** Supra note 63.

**67.** Note 16 supra & accompanying text. The 11th amendment, passed by over ³/₄ of the other states, reads:

"The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."

failed, the state constitutional provision has been thrown into the breach to sustain a crumbling legal concept." [68]

Pennsylvania courts did not unequivocally adopt sovereign immunity until 1851. *O'Connor v. Pittsburgh,* the seminal case, relied upon neither the Constitution of Pennsylvania nor upon legislative acts.[69] This Court thus adopted a "common law" rule in the sense that that term has been used in both the nineteenth and twentieth centuries. For example, in 1855 it was said:

> "The 'common law' consists of those principles, maxims, usages, and rules of action which observation and experience of the nature of man, the constitution of society, and the affairs of life have commended to enlightened reason as best calculated for the government and security of persons and property. Its principles are developed by judicial decisions as necessities arise from time to time demanding the application of those principles to particular cases in the administration of justice. The authority of its rules does not depend on any express legislative enactment, but on the principles they are designed to enforce . . . ." [70]

**68.** *Kitto v. Minot Park District,* 224 N.W.2d 795, 799 (N.Dak.1974) (abolishing doctrine of local government immunity despite a constitutional provision similar to Pa.Const. art. I, § 11, and cases holding that immunities of the state and of local governments are constitutionally based).

**69.** *O'Connor v. Pittsburgh,* 18 Pa. 187, 189 (1851) (Gibson, C.J.). The Court cited one legislative act to demonstrate the operation of sovereign immunity. Three earlier cases, *Respublica v. Sparhawk,* discussed supra notes 18–28 & accompanying text; *Black v. Rempublicam,* discussed supra notes 19, 29–30 & accompanying text; *Commonwealth v. Matlack,* discussed supra note 8, sometimes seen as adopting the rule, did not do so. The rule is stated in dictum in *Monongahela Navigation Co. v. Coons,* 6 Watts & S. 101, 113 (Pa. 1843) (Gibson, C.J.), without either citation or supporting reasoning. See generally note 8 supra (use of cases involving cities in discussing sovereign immunity).

**70.** *People v. Randolph,* 2 Parker Cr.R. 174, 176 (N.Y.1855), as quoted in 8 Words and Phrases "Permanent Edition", Common Law, at 109; accord *Kansas v. Colorado,* 206 U.S. 46, 96–97, 27 S.Ct. 655, 667, 51 L.Ed. 956 (1906), quoting 1 Kent's Commentaries 471; *Bishop v. United States,* 334 F.Supp. 415 (S.D.Tex.1971), rev'd, 476 F.2d 977

In *O'Connor,* this Court stated that "the prerogative of refusing to do justice on compulsion" was one of the attributes of sovereignty the American states took on themselves "at the declaration of American independence."[71] The Court saw sovereign immunity as predating, and unaffected by, the Constitution of 1790, and even the Constitution of 1776,[72] and as inherent in the Anglo-American notion of the State, without need for legislative or constitutional enactment. Thus when this Court adopted sovereign immunity in 1851, it viewed the doctrine as part of the common law.

The first judicial statement that article I, section 11 of the Constitution embodies the doctrine that the state may not be sued without its consent did not occur until 1934,[73] more than 140 years after the Constitution of 1790, and more than 80 years after judicial adoption of sovereign immunity in Pennsylvania.[74] In the years since 1934, this Court has frequently referred to article I, section 11 as the source of sovereign immunity. Indeed, in those years, it has advanced no other substantial justification for retaining the doctrine.[75]

(5th Cir. 1973), cert. denied, 414 U.S. 911, 94 S.Ct. 234, 38 L.Ed.2d 149 (1973). In reversing in *Bishop,* the Fifth Circuit did its own analysis of which principles and rules of action would best provide for security of persons and property. See 476 F.2d at 979–80.

71. 18 Pa. at 189.

72. Pa.Const. of 1776, adopted shortly after independence.

73. *Bell Telephone Co. v. Lewis,* 313 Pa. 374, 375, 169 A. 571, (1934) (alternate holding). There is one earlier mention of Article I, section 11, in connection with sovereign immunity in *Collins v. Commonwealth,* 262 Pa. 572, 106 A. 229 (1919). While this case states that the constitutional provision authorizes the Legislature to waive immunity, it does not say that the Constitution requires sovereign immunity in the absence of legislative action.

74. *O'Connor v. Pittsburgh,* supra note 8.

75. In *Morris v. Mt. Lebanon Twp. School Dist.,* 393 Pa. at 635–36, 144 A.2d at 738, this Court stated "the solution of the problem of governmental responsibility in tort is too complex an undertaking to permit . . . partial and piecemeal judicial reform." Needless to say, we rejected this supposed rationale for retaining government immunities in *Ayala v. Philadelphia Board of Public Educ.,* supra note 3.

Nonetheless, as late as 1963, this Court was deciding cases in which neither the Constitution, nor any case relying on the Constitution was used to support the proposition that the Commonwealth is immune from suit absent legislative consent.[76] Only in the past fifteen years has this Court regularly stated that article I, section 11, compels the doctrine of sovereign immunity.[77] This interpretation of the Constitution is certainly "a recent judicial construction . . . thrown into the breach to sustain a crumbling legal concept."[78]

Once the "errors of history, logic and policy"[79] which underly both sovereign immunity and the Commonwealth's constitutional interpretation have been laid bare, we see no reason to perpetuate them. Significantly, the people, the source of power to make the Constitution of this Commonwealth, have not ratified this erroneous interpretation of article I, section 11. The interpretation was not made until long after the plebiscite enacting the Constitution of 1873, and article I was not submitted to the people for reconsideration by the Constitutional Convention of 1968–69. Further, other states have rejected this reading of state constitutional provisions analogous to our article I, section 11.[80]

**76.** *Philadelphia Life Ins. Co. v. Commonwealth,* 410 Pa. 571, 190 A.2d 111 (1963); *Morris v. Mt. Lebanon Twp. School Dist.* 393 Pa. at 635–36, 144 A.2d at 738–39; *Brewer v. Commonwealth,* 345 Pa. 144, 145, 27 A.2d 53, 54 (1942); *Heil v. Allegheny County,* 330 Pa. 449, 453, 199 A. 341, 343 (1938).

**77.** See cases cited in note 57 supra.

**78.** *Kitto v. Minot Park District,* 224 N.W.2d 795, 799 (N.Dak.1974).

**79.** *Morris v. Mt. Lebanon Twp. School Dist.,* 393 Pa. at 635–36, 144 A.2d at 738–39.

**80.** *Flournoy v. State,* 57 Cal.2d 497, 20 Cal.Rptr. 627, 370 P.2d 331 (1962), following *Muskopf v. Corning Hosp. Dist.,* 55 Cal.2d 211, 11 Cal.Rptr. 89, 359 P.2d 457 (1961); *Perkins v. State,* 252 Ind. 549, 251 N.E.2d 30, 31–32 (1969); *Darville v. Associated Indemnity Corp.,* 323 So.2d 441 (La.1975), following *Bd. of Comm'rs v. Splendour Shipping & Enterprises Co.,* 273 So.2d 19, 23–25 (La.1973). Contra, *Krause v. State,* 31 Ohio St.2d 132, 285 N.E.2d 736 (1972); *Holytz v. City of Milwaukee,* 17 Wis.2d 26, 115 N.W.2d 618 (1962).

We therefore hold that article I, section 11 of the Pennsylvania Constitution does not preclude this Court from abrogating the doctrine of sovereign immunity.

## III

 Finally, the Commonwealth argues that sovereign immunity is so deeply imbedded in our judicial history that principles of *stare decisis* require that we continue to adhere to it. We need only repeat what this Court has stated many times in the past:

> "the doctrine of stare decisis is not a vehicle for perpetuating error, but rather a legal concept which responds to the demands of justice and, thus, permits the orderly growth processes of the law to flourish." [81]

Stare decisis should not be invoked to preserve a rule of law when "[there is] no better reason for [it] than [that] it was laid down in the time of Henry IV. It is . . . revolting if the grounds upon which it was laid down have vanished long since, and the rule persists from blind imitation of the past." [82] Were we to continue to adhere to the doctrine of sovereign immunity in light of its manifest unfairness and of our current knowledge that the doctrine is non-constitutional, we would be blindly imitating the past, for no reason better than that this was the way justice was administered in the feudal courts of Henry III.

We therefore abolish the doctrine of sovereign immunity and overrule all inconsistent cases.

Reversed and remanded for proceedings consistent with this opinion.

81. *Ayala v. Philadelphia Board of Public Educ.*, 453 Pa. at 606, 305 A.2d at 888. Accord, *Griffith v. United Air Lines*, 416 Pa. 1, 203 A.2d 796 (1964). *Ayala*, 453 Pa. at 605–06, 305 A.2d at 888, cites many cases in which this Court has recognized the need to abandon old legal doctrines in light of changed conditions.

82. *Biello v. Pennsylvania Liquor Control Board*, 454 Pa. at 192, 301 A.2d at 855 (Nix, J., joined by Roberts, J., dissenting), quoting collected Legal Papers of Oliver Wendell Holmes 187.

LARSEN, J., joins this opinion and files a concurring opinion.

O'BRIEN, J., filed a dissenting opinion in which EAGEN, C. J., and POMEROY, J., joined.

POMEROY, J., filed a dissenting opinion in which EAGEN, C. J., and O'BRIEN, J., joined.

LARSEN, Justice, concurring.

I join in Mr. Justice Roberts' opinion and wish to add that I can think of no greater function or more honorable pursuit than for the sovereign (Commonwealth of Pennsylvania) to care for those whom it has injured or maimed. Over thirty other sovereigns share this philosophy.

O'BRIEN, Justice, dissenting.

I respectfully but emphatically dissent. The majority of this court has usurped the power of the Pennsylvania legislature in abrogating the Pennsylvania Constitutional provision prohibiting suits against the Commonwealth unless the legislature directs that such suits may be filed.

Article I, § 11, of the Pennsylvania Constitution provides:

"All courts shall be open; and every man for an injury done him in his lands, goods, person or reputation shall have remedy by due course of law, and right and justice administered without sale, denial or delay. *Suits may be brought against the Commonwealth in such manner, in such courts and in such cases as the Legislature may by law direct.*" (Emphasis added.)

In *Biello v. Pa. Liquor Control Bd.,* 454 Pa. 179, 301 A.2d 849 (1973), this court stated:

". . . This language *consistently* has been interpreted to mean that no suit may be maintained against the state in tort until the legislature specifically has provided for such an action. *Meaghr v. Commonwealth,* 439 Pa. 532, 266 A.2d 684 (1970); *Bannard v. N. Y. S. Nat. Gas Corp.,* 404 Pa. 269, 172 A.2d 306 (1961); *Brewer v. Commonwealth,* 345 Pa. 144, 27 A.2d 53 (1942); *Bell Telephone Co.*

*v. Lewis,* 313 Pa. 374, 169 A. 571 (1934); *Collins v. Commonwealth,* 262 Pa. 572, 106 A. 229 (1919); *Fitler v. Commonwealth,* 31 Pa. 406 (1858). . . ." (Emphasis added.)

Article I, § 11, is a Pennsylvania constitutional provision not a creature of the common law capable of judicial modification or abolition, without a judicial determination that another Pennsylvania constitutional provision supersedes it or that it is repugnant to the United States Constitution. This court has no power to abrogate Article I, § 11, of the Pennsylvania Constitution. While sovereign immunity may have arrived in Pennsylvania in *Respublica v. Sparhawk,* 1 Dall. 357, 1 L.Ed. 174 (1788) as a judicial creation that creation was elevated to constitutional stature in the Constitution of 1790 and retained in the Constitution of 1873, and has remained in all of the constitutions up to and including today's constitution.

This court, while having consistently upheld the Commonwealth's right not to be sued without its consent, has consistently told the legislature that they and they alone do possess the power to make the Commonwealth amendable to suit. See *Brown v. Commonwealth,* 453 Pa. 566, 305 A.2d 868 (1973).

The majority today usurps the legislative power granted to elected members of the General Assembly and the Senate of Pennsylvania.

I dissent and would affirm the order of the Commonwealth Court.

EAGEN, C. J., and POMEROY, J., join in this dissenting opinion.

POMEROY, Justice, dissenting.

Article I, Section 11 of the Pennsylvania Constitution provides in pertinent part:

"Suits may be brought against the Commonwealth in such manner, in such courts and in such cases as the Legislature may by law direct."

The majority today holds that this constitutional provision does not mean what it says, and purports to abolish what it calls the "doctrine" of sovereign immunity. I respectfully dissent.

The majority's description of the lack of foundation in public policy for the continuance of the doctrine of sovereign immunity in the Commonwealth of Pennsylvania in the 20th Century is unexceptionable. Indeed, what the Court states in this regard is essentially a restatement of what has been quite clear to both courts and commentators for years. See generally, in addition to the authorities cited in the Court's opinion, *Laughner v. Allegheny County,* 436 Pa. 572, 576, 261 A.2d 607 (1970) (Pomeroy, J., dissenting). I would have no difficulty in joining the Court's abolition of sovereign immunity, and indeed would do so with enthusiasm, were I able to conclude that this Court is free to take such action. But I cannot so conclude. As I wrote in *Brown v. Commonwealth,* 453 Pa. 566, 574–75, 305 A.2d 868, 873 (1973) (concurring opinion):

"When by their Constitution the people of Pennsylvania have expressly delegated to the legislative branch of government the task of determining in what manner and in what court and in what cases the Commonwealth may be subjected to suit (and, implicitly, to the liability that may result therefrom), I fail to see how this Court can properly hold that it has a right to preempt this legislative function. A proposition that had its ancient origin in the common law of England and colonial America was elevated to constitutional status in Pennsylvania as long ago as 1790. To ignore this development would be to warp the plain meaning of the Constitution to suit societal ends which now, one hundred and eighty-three years later, the entire membership of this Court thinks are much to be desired. We may lament the legislative failure to correct before the present date an inequitable situation, but impatience should not cause us to upset the balance of power in our tripartite system of government by making the correction ourselves."

I remain of this view, and I am not persuaded to the contrary by the majority's historical discussion. As the Court concedes, we do not have the benefit of any of the debates during the 1790 convention to guide us to determining the intent of the drafters. Thus I doubt that the majority's historical speculation is sufficient to change what has long been the accepted construction of the constitutional provision—a construction which has been relied upon by the other branches of Pennsylvania government. But I believe that discussion on this point is in any event irrelevant, for it is well settled that a court should undertake an examination of a constitutional provision's historical setting only if the wording of the provision itself is ambiguous. *See, e. g., Firing v. Kephart,* 466 Pa. 560, 565, 353 A.2d 833 (1976); compare Statutory Construction Act of 1972, § 1921(c), 1 Pa.C.S. § 1921(c) (Supp.1978). I cannot find such an ambiguity in the constitutional provision.

Today's decision contains a further irony. After numerous decisions in which this Court has called upon the Legislature to take the comprehensive action necessary to deal with the problem of the Commonwealth's immunity in tort,[1] *e. g., Brown v. Commonwealth, supra,* 453 Pa. at 572, 305 A.2d at 871; *id.* at 576–77, 305 A.2d at 874 (Pomeroy, J., concurring), such action is now apparently forthcoming. After lengthy study, the General Assembly's Joint State Government Commission has issued a report[2] recommending legislation that would permit negligence actions against the Commonwealth

1. As the Court's opinion indicates, the Legislature has over the years provided a means of redress for those with claims other than those founded on negligence against the Commonwealth. Act of April 13, 1782, § 1, 2 Sm.L. 19. See also Act of March 30, 1811, P.L. 145, 5 Sm.L. 228; Fiscal Code, Act of April 9, 1929, P.L. 343, art. IV, § 405, 72 P.S. § 405 (1949). But the Legislature has also been careful to refuse to authorize suits of other types. Appellate Court Jurisdiction Act, Act of July 31, 1970, P.L. 673, § 401(c), 17 P.S. § 211.401(c) (Supp.1978); Judicial Code §§ 761(c), 5101(b), 42 Pa.C.S. §§ 761(c), 5101(b) (Special Pamphlet, 1977) (not yet effective).

2. See the booklet "Sovereign Immunity", published by the Joint State Government Commission, Harrisburg, Pa., May, 1978.

in eight specific areas but require that immunity be retained in all other areas. In addition, suits would be permitted only for causes of action arising on or after July 1, 1979.[3]

Having for a number of years invited the Legislature's attention to this subject and being now advised that a definitive response has been proposed after serious study, for this Court to inform the Legislature, as it does today, that the Commonwealth is liable to suit by any person on any cause of action (for the reach of today's decision cannot be limited to torts) comes with ill grace and without the justification of some compelling new reason.

For the reasons above stated, I dissent.

EAGEN, C. J., and O'BRIEN, J., join in this dissenting opinion.

3. The bill proposed by the Joint State Government Commission was introduced into the House of Representatives on April 19, 1978 with broad sponsorship as H.B. 2437 (Printer's No. 3435) and referred to the Committee on Judiciary. It has since been reported by the House Judiciary Committee to the floor for consideration by the full House. Pa.L.J., June 19, 1978, at 7.