Commonwealth of Pennsylvania, Governor's Energy Council, Petitioner *v.* American Energy Services, Inc., Respondent.

Argued May 7, 1985, before Judges ROGERS and BARRY and Senior Judge BARBIERI, sitting as a panel of three.

*Roger E. Clark,* Acting Chief Counsel, for petitioner.

*C. Grainger Bowman, McNees, Wallace & Nurick,* for respondent.

OPINION BY JUDGE ROGERS, June 18, 1985:

The Commonwealth of Pennsylvania, Governor's Energy Council (GEC) has filed a petition for review of a judgment in the amount of $22,747.60 and interest, entered against "Commonwealth of Pennsylvania, Governor's Energy Council" and in favor of American Energy Services, Inc. (AES) by the Board of Claims. AES had sued GEC for damages caused by GEC's asserted breach of a contract for services.

The GEC is an agency of the Commonwealth of Pennsylvania created by an executive order of the Governor "to insure the proper management and energy use throughout the Commonwealth." AES is a corporation engaged in counseling businesses in the use of computers for the management of data related to the conservation of energy.

By stipulation of facts and from uncontested evidence received by the Board of Claims, we learn that: In November, 1978, GEC requested competitive bids

for the development and implementation of a residential energy analysis computer program to be used in conjunction with the Governor's Energy Hotline, a toll-free telephone information service provided by GEC to residents of the Commonwealth. AES submitted a timely bid and, by letter dated January 9, 1979, Ronald E. Gargasz, GEC's Chief Contracting Officer, informed Michael Mark, the president of AES, that AES' bid had been accepted. Shortly thereafter, Mr. Mark received a telephone call from Mr. Gargasz informing him that the contract had been mailed to AES, that it was imperative that AES begin working on the project immediately, and that GEC would reimburse AES for its expenses in the event that final approval of the contract was not obtained. On January 26, 1979, Mr. Gargasz sent Mr. Mark the contract accompanied by a letter requesting that Mr. Mark review the contract, sign it, and return it to GEC. The letter further provided that:

> It is essential that you return your signed contract as soon as possible so that we may obtain the remaining signatures required within the state process. Although this process will take four to six weeks to complete, this letter serves as authorization for all documented expenditures drawn against the contract as of the effective date, February 1, 1979.

Mr. Mark signed the contract, returned it to Joseph Toia, the Budget Director of GEC, who also signed it and then forwarded it for additional signatures in the state process. Because GEC's contract with AES was to be funded by the federal government, it was required to be submitted to the United States Department of Energy (DOE) for its review and approval.

In February, 1979, after receiving assurances from Gargasz that approval of the contract by DOE was a "mere formality," AES commenced work on the proj-

ect. Invoices were submitted by AES on March 30, 1979, April 30, 1979, June 5, 1979, and July 9, 1979 for accumulated expenses totalling $22,747.60. When these invoices were not timely paid, Mr. Mark telephoned Mr. Gargasz who, according to Mark, told him that DOE had a backlog of contracts to review and that approval was still a mere formality. During the period covered by the invoices, employees of AES worked closely with officials of GEC who reviewed and approved of their performance of the initial phases of the contract.

It happened that DOE did not approve the contract. On July 16, 1979, Edward B. Bigelow, assistant to the Director of GEC, informed Mr. Mark in writing that GEC was reviewing its purchase of a computer program for the energy hotline and that AES should do no more work on the project. Thereafter, GEC refused to pay AES for the services it had provided claiming that the contract was ineffective because it had not been executed by the state.

The Board of Claims, after a hearing, found that GEC had induced AES to believe that it would be paid for its work done during the state signing process and that AES reasonably relied and acted on that belief. The Board of Claims concluded that GEC should be equitably estopped from defending the claim on the ground that the state had not fully executed the contract.

Section 507(c)(4) of the Administrative Code, Act of April 9, 1929, P.L. 177, *as amended,* 71 P.S. §187(c)(4) provides that any Commonwealth department, board or commission may:

Employ professional or skilled labor, on a temporary basis, in instances where the Department of Property and Supplies does not have an applicable contract, but all such employment shall be approved by the Governor. . . .

GEC contends that Section 507(c)(4) sets forth the exclusive method of contracting with a state agency and that since the employment of AES had not been approved by the Governor or any officially approved surrogate, there simply was no contract. Its thesis is that equitable estoppel may not be, and in this case should not have been, used to create an obligation where none existed.

Equitable estoppel is a doctrine founded upon consideration of fairness in the circumstances of the case; it arises when a party, by acts or representations intentionally or through culpable negligence, induces another to believe that certain facts exist and to rely and act on such belief, so that the actor will be prejudiced if the inducing party is permitted to deny the existence of such facts. *Blofsen v. Cutaiar,* 460 Pa. 411, 333 A.2d 841 (1975).

The leading case in the field is *Department of Public Welfare v. UEC, Inc.,* 483 Pa. 503, 397 A.2d 779 (1979). The Commonwealth entered into a written agreement with UEC for the latter to program, design, develop, and maintain a system of day care centers. The contract was for a period of one year and thereafter from year to year subject to cancellation by either party on sixty days' written notice. Sixty days prior to the end of the first year's contract, the Department of Public Welfare informed UEC that the contract would not be renewed. Thereafter, officials of the Commonwealth at the highest level informed UEC that, notwithstanding the notice of cancellation, negotiations to extend the contract would be reopened. During the negotiations, UEC agreed to maintain its operation of the day care centers and did so for some five months until it was informed by DPW that its contract would not be renewed. During the following two year period, the Commonwealth officials repeatedly assured UEC of the Commonwealth's intention

to pay UEC for the services provided after the first contract had expired. Following further negotiations a settlement was reached. When the Commonwealth refused to pay UEC in accordance with the terms of the settlement agreement, UEC instituted action seeking payment thereof. The Commonwealth asserted that the claim was barred by the running of the applicable statute of limitations. UEC, on the other hand, argued that the Commonwealth should be estopped from asserting the six-month limitation on claims as a defense to its obligations under the contract.

Justice LARSEN, writing for the court, noted that the application of estoppel should not be denied merely because it is being asserted against the government and that:

> Many courts have exhibited great reluctance in applying the doctrine against the government. . . . The grounds generally advanced for this reluctance bear striking similarity to those offered in support of the doctrine of sovereign immunity. . . . As we have recently discarded that doctrine because it was "unfair and unsuited to the times," Mayle v. Pennsylvania Department of Highways, 479 Pa. 384, 388 A.2d 709, 710 (1978), it would be inconsistent to refuse to apply the doctrine of equitable estoppel to prevent assertion of a statute of limitation merely because it is applied against the Commonwealth when all of the traditional elements of estoppel have otherwise been established. (Citations omitted.)

*Id.* at 514, 397 A.2d at 785. The Pennsylvania Supreme Court concluded that the Commonwealth was estopped from asserting the statute of limitations as a defense because it had lulled UEC into a false sense of security regarding the necessity of instituting legal action by repeated assurances that UEC's claim would be paid.

In *Department of Revenue, Bureau of Sales and Use Tax v. King Crown Corp.*, 52 Pa. Commonwealth Ct. 156, 415 A.2d 927 (1980), this court held that the Commonwealth should be estopped from denying the validity of a compromise agreement negotiated by a Commonwealth assistant attorney general with a taxpayer.

Here, AES reasonably relied on statements made by GEC officials that it would be reimbursed for expenses incurred prior to the final approval of the contract. As noted, after notifying AES that it had been awarded the contract, Mr. Gargasz telephoned Mr. Mark and informed him that AES should begin working on the project immediately and that GEC would reimburse it for the expenses it incurred. These statements were repeated in Mr. Gargasz's letter of January 26, 1979 to Mr. Mark informing that "all documented expenses drawn against the contract were authorized as of February 1, 1979." Additionally, GEC officials worked closely with employees of AES in the performance of the initial phases of the contract. Thus, the Board of Claims properly held GEC to be estopped from taking the position that "all documented expenses" were not authorized.

GEC finally contends that the Board of Claims improperly calculated the amount of AES' damages; that damages should be measured by the value of the services to the Commonwealth; and that since GEC decided not to use a computer program with the energy hotline, the services rendered by AES were valueless. We disagree. Where, as here, the recipient of services is more at fault than the provider, the measure of recovery is the reasonable value of the services rendered, regardless of their value to the recipient. Restatement of Restitution §40, comment f (1937). AES adduced ample evidence in the form of time sheets and expense vouchers from which the

Board of Claims could conclude that the reasonable value of its services was $22,747.60.

Judgment affirmed.

ORDER

AND NOW, this 18th day of June, 1985, the judgment entered by the Board of Claims in the above-captioned matter is affirmed.

Judge PALLADINO did not participate in the decision in this case.