573 A.2d 241

**FR & S, INC., a Pennsylvania corporation, Petitioner,**

**v.**

**COMMONWEALTH of Pennsylvania, DEPARTMENT OF ENVIRONMENTAL RESOURCES, Respondent.**

**FR & S, INC., Petitioner,**

**v.**

**COMMONWEALTH of Pennsylvania, DEPARTMENT OF ENVIRONMENTAL RESOURCES, Respondent.**

Commonwealth Court of Pennsylvania.

Argued Nov. 15, 1989.

Decided March 15, 1990.

Reargument Denied May 1, 1990.

William F. Fox, Jr., with him, Richard J. Tompkins, Fox, Differ, Callahan, Ulrich & O'Hara, Norristown, for petitioner.

Norman G. Matlock, Asst. Counsel, for respondent.

Before CRUMLISH, Jr., President Judge, and CRAIG, DOYLE, COLINS, PALLADINO, McGINLEY and SMITH, JJ.

CRAIG, Judge.

FR & S, Inc., owner of a landfill in Berks County, has appealed a decision of the Environmental Hearing Board (EHB) issued July 14, 1989, which sustained an action of the Pennsylvania Department of Environmental Resources (DER) denying FR & S' application for a permit to operate the landfill under the Solid Waste Management Act.[1]

The issues, in general terms, are twofold:

1. Where DER in 1979 approved a 1978 permit application of FR & S, received in 1980 a collateral bond relating to that approval for the years 1981–1983, allowed landfill operation by FR & S in the period 1980–1983, but issued a denial of the 1979 application by letter dated April 11, 1983, is FR & S now entitled to de jure issuance of that permit on the basis of legal entitlement, or on the basis of an estoppel barring further denial?

2. Is FR & S now entitled to a permit to operate the landfill on the basis of recent EHB findings affirming the technical compliance of the site and on the basis that replacement management of FR & S has capacity for proper operation, disassociated from the deficient acts of previous management?

*History of the Litigation*

This landfill has been the subject of litigation in this court, between FR & S and DER, since 1978, when, at 2252 C.D.1978, this court, partly on the basis of a 1977 DER consent order and partly on the basis of new evidence, issued an order to avoid pollution threats and prescribed a permit application and inspection process.

After FR & S had operated the landfill during the 1980–83 period and FR & S had appealed DER's denial of April 11, 1983 to the Environmental Hearing Board, operation of the landfill continued under supersedeas until halted by the EHB in August 1984, after which further action in this

1. Act of July 7, 1980, P.L. 380, *as amended,* 35 P.S. §§ 6018.101–6018.-1003.

court resulted in FR & S being ordered to close the landfill in February 1985 for noncompliance with 1984 court orders as well as the 1984 EHB directions.

FR & S' EHB appeal, from the April 1983 denial, proceeded through thirty-nine days of hearing before an examiner, but after conclusion of those hearings in August of 1984, the spring of 1987 came without any decision by the EHB. In *FR & S, Inc. v. Pennsylvania Department of Environmental Resources*, 104 Pa.Commonwealth Ct. 647, 522 A.2d 1190 (1987), *aff'd*, 522 Pa. 114, 560 A.2d 128 (1989) (*FR & S I*), this court gave initial procedural approval to the use of mandamus by FR & S to compel the EHB to issue a decision which had not been forthcoming for 2½ years.

Although the EHB appealed this court's order in *FR & S I*, that board nevertheless, without waiting for resolution of the appeal or completion of the mandamus case, proceeded to issue a decision in June of 1987, denying relief to FR & S. Former EHB member Anthony Mazullo, who had presided over the reception of evidence at the hearings, had drafted a decision, but that decision was never issued, and Mr. Mazullo resigned from the board before the issuance of the June 1987 decision.

On appeal of that June 1987 decision of the EHB, this court, in *FR & S v. Pennsylvania Department of Environmental Resources*, 113 Pa.Commonwealth Ct. 576, 537 A.2d 957 (1988), *aff'd*, 522 Pa. 114, 560 A.2d 128 (1989) (*FR & S II*), vacated the EHB's June 1987 decision on account of bias and denial of due process, and remanded the case to the EHB for a new decision on the existing record, without the participation of the two board members who had issued that 1987 decision.

When this court, pursuant to *FR & S II*, remanded the case to the EHB for a new adjudication, the EHB had one new member who had not participated in the decision rejected by the courts, and that new member proceeded expeditiously to issue a thorough new adjudication on July 14,

1989.[2]

*Legal Standards as to Proof and Findings*

Of course, FR & S had the burden of proof before the EHB with respect to the facts.

■ With respect to this court's scope of review over the EHB's decision, the court must affirm the adjudication unless it is in violation of constitutional rights, not in accordance with law, or unless "any finding of fact made by the agency and necessary to support its adjudication is not supported by substantial evidence." 2 Pa.C.S. § 704. That substantial evidence test as to findings of fact prevails here, where both sides have presented evidence. *Estate of Mc-Govern v. State Employees' Retirement Board*, 512 Pa. 377, 517 A.2d 523 (1986). *Kirkwood v. Unemployment Compensation Board of Review*, 106 Pa.Commonwealth Ct. 92, 525 A.2d 841 (1987).

Thus, the standard here is not the "capricious disregard" standard suggested by DER in its brief.

In *Russell v. Workmen's Compensation Appeal Board*, 121 Pa.Commonwealth Ct. 436, 440–41, 550 A.2d 1364, 1366 (1988), this court explained that

> the 'capricious disregard' test is the appropriate standard to apply ... where the burdened party is the only party to present evidence and does not prevail before the agency. In all matters, however, where both parties present evidence, the agency's determination will be reviewed under the 'substantial evidence' test as indicated in Mc-Govern.

*Farquhar v. Workmen's Compensation Appeal Board*, 515 Pa. 315, 528 A.2d 580 (1987), where only the appellant

**2.** A second new member joined the EHB after the filing of *FR & S II*. In response to an inquiry by counsel, this court declined to issue any post-filing elaboration of the court's order, concerning whether the newest board member should participate or not, because neither party had raised that detailed issue before the court. Possibly because his accession came in the second month after the filing of *FR & S II*, so that his participation could have extended the time needed for a new adjudication, that second new member did not participate.

claimant had presented evidence, provides the Supreme Court's confirmation that the capricious disregard standard is to be used in reviewing a record in that posture.

### 1. The 1983 Permit Approval, Non-issuance and Denial

The EHB adjudication here under review contains findings as to the history of FR & S' permit applications, permits and denials which are lucid and well supported by the record. In 1970, the Pennsylvania Department of Health, DER's predecessor in these matters, issued a permit to FR & S authorizing it to operate a sanitary landfill until the end of 1970. After that permit expired, FR & S continued to operate the landfill, and was allowed to do so, while it was attempting to satisfy departmental requirements. In 1977, FR & S and DER entered into a consent order as to specific operational actions, with FR & S being required to submit a new permit application by February 1, 1978.

After FR & S timely submitted that application, DER listed deficiencies in it and finally denied the application in September of 1978. After FR & S had resubmitted an application in October of 1978, this court, in the enforcement action brought by DER at 2252 C.D.1978, allowed FR & S to continue operating the landfill under specified conditions until completion of review of the latest application data.

According to EHB Finding 15, the landfill's surroundings present substantial difficulties, including an unregulated dump nearby, properties with malfunctioning on-site sewage disposal, badly eroded motorcycle club land, a trailer court with overflowing on-site sewage disposal, an abandoned landfill, a deposit of foundry refuse and domestic wastes, an automobile salvage operation with a malfunctioning on-site sewage disposal system, an unsheltered storage site for pig iron and coke, a foundry sand recycling operation and a deposit of abandoned vehicles, metal drums and slag. Leachate from the foundry refuse and domestic

waste site seeps periodically into the intermittent stream which constitutes a drainage course on the FR & S site. Pursuant to this court's 1978 order, FR & S has constructed a diversion ditch to keep the waters of that stream out of FR & S' north pond and to carry them around the site, and has also installed a 24–inch pipe to carry that stream under the landfill to a controlled discharge point. FR & S has installed leachate drains and leachate storage tanks.

On November 30, 1978, DER's Mr. Washko advised DER Regional Director Moyer that FR & S had satisfied the 9 items listed in DER's rejection letter of September 1978, and Mr. Washko recommended issuance of a permit to FR & S subject to stipulations (Findings 33, 34). On February 9, 1979, DER advised FR & S by letter that an NPDES permit was tentatively approved, and FR & S received the required approval from the Delaware River Basin Commission (Findings 37, 38). Sometime before 1983, DER prepared a permit for the FR & S landfill, which was signed by DER's director of solid waste management but left undated. Also before April 1983, DER prepared a water quality management permit for the FR & S landfill, signed by DER's regional water quality manager, but also undated (Findings 39, 40).

In 1979 and 1980, following DER's submission of collateral bond forms to FR & S and an order of this court pursuant to DER enforcement proceedings, FR & S was required to file a collateral bond, and it did so in November of 1980 (Findings 41–43).

In December of 1980, DER prepared a news release announcing that a permit would be issued to the FR & S landfill within the next few weeks, but that announcement was never released, FR & S did not receive any permits, and DER counsel marked the permit documents "void" early in 1983 (Findings 39, 45, 46).

The filing of a collateral bond, normally the last stage of the permit issuance process and usually done pursuant to an issued permit, was accomplished by FR & S in 1980 and kept on file into 1984 (Findings 47–49).

However, on April 11, 1983, DER denied the 1978 application, citing 17 deficiencies, and ordered the landfill closed on April 16, 1983. This court, in April and June of 1983, allowed the landfill to operate under a stay pending an EHB decision on supersedeas. (Findings 60, 61)

Donald L. Peifer was FR & S operator of the landfill from 1973 until June 1984. During that period he made changes without providing plans or obtaining approvals from DER, he installed a gas venting system without a permit, he consistently ignored DER's requirements as to cover, as to slopes, as to operational records, as to sludge, and as to reports, and he mismanaged the application of leachate and the control of leachate collection odors. (Findings 106, 107)

The adjudication also contains findings affirming the suitability of the strata underlining the landfill as a natural liner, the suitability of soils in the sites, the effectiveness of the leachate collection system and other correctable matters, all matters determined after the permit denial of April 11, 1983.

Although it may be possible, by further dissection of the 39 days of hearing before the EHB, to examine the validity of that 1983 permit denial by reference only to facts which occurred before it took place, such a determination would have only historical value and would not be relevant to the actual situation now prevailing. To confine this court's review and DER's administrative controls to a period which ended seven years ago would be shortsighted, in view of the fact that this record contains detailed and useful evidence with respect to situations and events which came into being after April 1983, such as the 1984 and 1985 occurrences, which included the withdrawal of Mr. Peifer from active management in June of 1984 and his replacement by a new management team, as well as the court-approved mandates to lower leachate levels in 1984 and this court's confirmation of the closing of the landfill in 1985.

The dynamic nature of the events surrounding this landfill and the positive and negative occurrences after 1983 have made it impossible to rule on whether there was an

effective approval of the 1978 application in 1980, secured by FR & S' collateral bond filings in the succeeding three years.

Moreover, in view of the violations committed under Mr. Peifer's management in the latter part of 1983 and the early part of 1984, a ruling on whether or not FR & S had a de jure permit in 1980, and throughout the 1980–84 period, would have no present value, because, even if there had been a permit issuance in 1980, subsequent violations would have warranted revocation of that permit.

As an alternative to contending that there was a substantial issuance of the permit by DER in 1980, FR & S here argues that the department should be estopped from denying that issuance on the ground that DER's actions consistent with permit issuance were such as to induce FR & S to commit itself to expenditures and actions in reliance upon the department's condition. FR & S cites *Blofsen v. Cutaiar*, 460 Pa. 411, 333 A.2d 841 (1975), *Department of Public Welfare v. UEC, Inc.*, 483 Pa. 503, 397 A.2d 779 (1979), *Commonwealth Government Energy Council v. American Energy Services*, 90 Pa.Commonwealth Ct. 168, 494 A.2d 72 (1985).

Even though the present findings of the EHB confirm that DER, by its communications as to approval, by its approval of an NPDES permit, and by its acceptance of a collateral bond, induced FR & S to act as if it had a permit, so that FR & S expended a great deal of funds by obtaining the collateral bonds and by providing facilities and management for the site, confirmation of the 1980 permit by estoppel has no relevance to whether FR & S retains a present entitlement to a permit in the face of the 1983 and 1984 actions which resulted in closure orders by DER and by this court, having an effect tantamount to that of a permit revocation if a permit had been issued formally.

Because the very nature of administrative and judicial adjudications is retrospective, consisting of the evaluation of matters which occurred in the past, no one can be surprised that the adjudication of the relationship between

FR & S and DER has lagged behind the ongoing events. However, the complexity of this relationship and the unique nature of the adjudications—including, but not limited to, the EHB decision rejected in *FR & S II*—suggest that the parties and this court can accomplish an effective disposition only by moving to the present, to reach the issue of whether the landfill site now meets technical requirements and whether the replacement management now in place has acted so as to obtain or forfeit permit entitlement.

### 2. Technical Compliance of the Site and Adequacy of Replacement Management

■ In detailed technical Findings 63–104, inclusive, the present EHB adjudication has specified the technical status of all relevant aspects of the landfill. In Findings 113 and 114, the adjudication confirmed the departure of Mr. Peifer as operator and the installation of the new management team, as well as occurrences within the period of two months after the arrival of that replacement management.

The EHB's findings and conclusions concerning the technical compliance of the site at present are well summarized in the adjudication's syllabus, which states that FR & S has sustained its burden of proof with respect to the following:

(1) That the existing landfill site meets DER's requirements for a "natural" liner;

(2) That the soils and the site meet DER's suitability and quantitative requirements for cover materials;

(3) That the leachate collection system is basically effective; and

(4) That the other cited deficiencies are technical in nature and capable of being corrected....

That syllabus summarizes Findings 63–104 noted above, and fairly supports the following conclusions of the adjudication:

4. The site of the existing FR & S landfill is underlain by a naturally occurring impermeable zone meeting the requirements of 25 Pa.Code § 75.25(*o*)(6)(iii).

5. FR & S has not shown that the proposed expansion site also is underlain by a naturally occurring impermeable zone meeting the requirements of 25 Pa.Code § 75.25(o)(6)(iii).

6. The soils on the landfill site are of suitable quality and sufficient quantity for use as intermediate and final cover material.

7. The leachate collection system, modified to include an environmentally acceptable way of relieving storm-related pressures, is entitled to approval.

8. The more technical deficiencies found by DER in the application are capable of being cured and should not be used as a basis for final rejection.

As the forthright discussion in the adjudication notes, the relevant evidence makes it clear that the existing FR & S landfill site fulfills the requirements of 25 Pa.Code § 75.25(o)(6)(iii) for the use of a "natural" liner. On the other hand, the proposed expansion area does not qualify for reliance on the natural liner. The discussion in the adjudication confirms that the leachate collection system is of working acceptability and can be approved, and other deficiencies are capable of being cured "and should not be used as a basis for final rejection."

An interesting, but not conclusive, comment in the present adjudication notes that the never-issued draft adjudication of former member Mr. Mazullo, who received the evidence, "would have required DER to issue a permit to FR & S but would have barred Donald L. Peifer from acting as agent or operator of the landfill."

Both that sidelight and the focus of the present adjudication indicates that the pivotal rule here is section 503(c) of the Solid Waste Management Act, 35 P.S. § 6018.503(c), which authorizes denial of a permit if DER finds that the applicant "has failed or continues to fail," or "has shown a lack of ability or intention," to comply with environmental laws and requirements. Subsection (d) of that section provides that any person whose agent has engaged in "unlawful conduct" shall be denied a permit unless the application

can demonstrate to the satisfaction of the department "that the unlawful conduct has been corrected." Section 610, 35 P.S. § 6018.610, defines "unlawful conduct" as operating without a permit, operating in violation of law or regulations, operating so as to create a nuisance or threat to the public or refusing, hindering, obstructing any representative of DER in the performance of duty.

The adjudication correctly does not base any negative determination upon the occurrence of the substantial periods of operation without a formal permit which have transpired in this case, in view of the fact that such operation was allowed either by DER or the Commonwealth Court during much of its span.

From Findings 106–112, which are well supported by testimony throughout the record, there is no doubt that the actions of former operator Peifer were such as to disqualify FR & S. However, Mr. Peifer resigned as authorized agent of FR & S and withdrew from the operation on June 13, 1984 (Finding 113).

A new management team then took over. The new management committee was chaired by an attorney (who has since withdrawn) and had two other members. Those three have relied upon a professional engineer and a professional hydrogeologist for decisions and guidance. (T. 4804, 4813) After the attorney chairman took over, he toured the landfill with DER personnel to become familiar with it. On July 2, 1984, the replacement management hired Michael Kapuschinsky as a full-time on-site landfill manager, who began work on July 9, 1984. As manager, he follows the orders of the new committee and their engineers, not Mr. Peifer. (T. 4389–4396)

Of course, this court cannot place any reliance upon the insight that the former EHB member Mazullo, who heard the testimony, apparently approved the new management team, unrelated to Mr. Peifer. Before us, instead, are the findings of the adjudication with respect to occurrences after Mr. Peifer's June 13, 1984 departure. In Finding 114, the adjudication noted the following:

(a) On June 15, 1984, liquid was pumped from the North Pond onto the surface of the site and thence to the diversion ditch;

(b) noxious odors spread from the landfill site;

(c) on July 7, 1984, leachate overflowed the South Pond and went into the intermittent stream course;

(d) on July 27, 1984, a black liquid was pumped from the North Pond onto the surface of the site and on June 13, 1984 and August 6, 1984, there were other violations.

Because the present adjudication refuses a permit solely on the basis of the unlawful conduct of management and therefore has disapproved the replacement management, not upon any lack of personal qualification, but upon the basis of the violations cited in Finding 114, the final issue is whether there is substantial evidence to support the linking of such matters to replacement management. The adjudication concludes, in Conclusion No. 11, that the "unlawful conduct" of replacement management establishes that FR & S is not capable of correcting the unlawful course of conduct of previous management.

First, with the record establishing that the new on-site manager came onto the site on July 9, 1984, it is clear that only the July 27 and August 6 problems could be attributed to new management because the violations attributed to June 13, June 15 and July 7 antedated the installation of the new team's operator, Mr. Kapuschinsky.

However, because the competence and integrity of the new management is of prime importance, the court must examine the record support for the EHB findings with respect to the events of June 13, June 15, July 7, July 27 and August 6, 1984.

According to Finding 114(a), water was pumped from the North Pond onto the surface of the site and thence to the diversion ditch on June 15, 1984. The record (T. 4258, 4259) literally confirms that there was such a pumping of water with elevated ammonia level. However, DER's own inspector testified that such water was not leachate (T. 4261, 4262). The new management chairman nevertheless took

heed from DER personnel and took steps to see to it that the flow ceased (T. 4261, 4330).

With respect to Finding No. 114(b), that noxious odors existed on the landfill site on June 15, the record confirms that there were leachate ponds creating such an odor at that time, two days after the accession of replacement management. (T. 4191) The solution was to remove the leachate from the site to the Exeter Township treatment plant (Findings 98, 99). FR & S had agreed to contribute toward the construction of leachate collection facilities and to grant Exeter Township the necessary easements across FR & S property; FR & S actually paid $10,000 as earnest money. (Finding 100) However, when Exeter Township sought approval from DER to accept FR & S leachate, DER withheld action because DER legal counsel put a hold on it. (Findings Nos. 101, 102) Not until July 2, 1984, about a month after the date of odors noted in Finding No. 114(b) did DER notify Exeter Township that it could proceed with taking FR & S leachate (Finding No. 104).

According to Finding No. 114(c), leachate overflow from the FR & S South Pond went into a stream channel. However, according to the record, FR & S replacement management requested DER permission to pump down the related North Pond to ward off an overflow in view of a heavy rain forecast. With no approval from DER, the overflow occurred on July 7. (T. 4570–4580)

According to Finding No. 114(d), "a black liquid was pumped from the North Pond onto the surface of the site...." However, the record showed that the pump was not connected to the leachate collection system. (T. 5077–5079)

Aside from the fact that the problems cited in Finding No. 114 either antedated the arrival of the new management's operating head or came on dates which occurred before the new management had been established for any appreciable length of time, Finding No. 114 fails to identify any active involvement of the new management in the problems cited. The finding states that "liquid was

pumped," that "noxious odors spread," that "leachate over-flowed," and that "a black liquid was pumped," without any identification of who was acting or the context of any action taken. Such unspecific generalities are not sufficient to discredit new management and render ineligible a site which otherwise is regarded as being in compliance.

DER's brief does not offer any scrutiny of the record whatsoever to negate or explain the record passages which recite the occurrences in June, July and August of 1984, and fails to relate them to the fault of replacement management or their on-site operator.

### Conclusion

Therefore, because this record and adjudication present well supported findings attesting to the technical adequacy of the FR & S landfill site, not including the expansion area, and because there is a lack of substantial evidence support as to the disqualification of the replacement management, the conclusion must be that there is compliance with the Solid Waste Management Act requirements, the pertinent regulations and other elements, so that the EHB decision should be reversed and issuance of a permit ordered, subject to the posting of required collateral bond, the limitation of operations to the existing site and not the expansion area, the continued exclusion of Donald L. Peifer from operating control, and continuance of control in the hands of replacement management.

### ORDER

NOW, March 15, 1990, the decision of the Environmental Hearing Board at EHB Docket No. 83–093–M, issued July 14, 1989, is reversed, and the Department of Environmental Resources is ordered to issue the permit, subject to the exclusion of the expansion area, the posting of required collateral bond, and the continuing of operating control in the replacement management, with Donald L. Peifer excluded from such control.