**Evelyn SHOOP, Suzette Shoop and Brenda Webster, Plaintiffs,**

v.

**DAUPHIN COUNTY; William Livingston, Sheriff of Dauphin County; Richard Shroy and Charles C. Fisher, Deputy Sheriffs of Dauphin County; State Police Trooper Ralph McAllister; and Judith A. Vallier, Defendants.**

Civ. A. No. 3:CV–89–1498.

United States District Court,
M.D. Pennsylvania.

Jan. 22, 1991.

John D. Briggs, Lancaster, Pa., Mark Lane, Washington, D.C., William E. Haggerty, Morgan, Hallgren, Crosswell & Kane, P.C., Lancaster, Pa., for plaintiffs.

R. James Reynolds, Jr., Foulkrod, Reynolds & Havas, Rolf E. Kroll, Craig A. Stone, Mette, Evans & Woodside, Timothy Andrew Hoy, Eckert, Seamans, Cherin & Mellott, Michael L. Harvey, Office of Atty. Gen., Harrisburg, Pa., for defendants.

## MEMORANDUM

RAMBO, District Judge.

Defendants Ralph McAllister and Dauphin County, William Livingston, Richard Shroy and Charles Fisher (the county and Livingston, Shroy and Fisher will collectively be referred to as the "Dauphin defendants") have filed motions for partial summary judgment. The motions have been fully briefed. The court will address the two motions together.

*Background*

Many of the facts which provide the basis for this case are in dispute. In detailing the factual background the court will recite undisputed facts, and when necessary, identify and state portions of the chronology which are in dispute. On the morning of November 3, 1987, election day, Dauphin County deputy sheriffs Richard Shroy and

Charles Fisher arrived at the Fisherville Fire Hall, a Dauphin County polling place. According to Shroy and Fisher, they went to the fire hall pursuant to a verbal order of Dauphin County Court of Common Pleas Judge Jack Dowling to investigate a possible disturbance at the polls. Plaintiffs deny the existence of a court order, and contend that the deputies were acting only on the orders of the Sheriff's department. Upon arrival, Shroy and Fisher found the fire hall calm. They asked a third deputy, James Hallman, who had been present at the fire hall the bulk of the morning, if there had been any disturbances. Hallman replied that there had been a number of sharp comments traded between plaintiff Evelyn Shoop ("Mrs. Shoop"), a poll watcher, and several of the other elections officials. Much of the hubbub centered on Evelyn Shoop's belief that the Judge of Elections, Judy Vallier, had been permitting her parents to vote in local elections when they did not reside in the district. Shroy and Fisher then spoke to Vallier, who told them that Evelyn Shoop had been making unsavory comments toward some of the people at the fire hall, and that because of Mrs. Shoop's conduct the election board was threatening to walk out.

Deputy Fisher then left the polling area and called the sheriff's office to relate what he had heard and to obtain further orders. The Dauphin defendants assert that Fisher spoke with Chief Deputy Sheriff Carmen Henderson, who relayed Fisher's information to Judge Dowling. Judge Dowling then, according to the Dauphin defendants, ordered Henderson to have Mrs. Shoop removed from the polling place. Plaintiffs vigorously dispute this assertion, and counter that Judge Dowling never gave any order, but that Henderson did issue an "illegal", order to the deputies.

Fisher went back to the fire hall and advised Mrs. Shoop that the court had ordered her to leave the premises. Mrs. Shoop refused to move until she was shown a written order. Fisher then left the hall again and, he states, called the sheriff's office to reconfirm his orders. Thereupon he returned to the hall and, along with Shroy, attempted to physically remove Mrs. Shoop. A scuffle ensued.

After this altercation, the defendant deputies retreated, and defendant Ralph McAllister, a state trooper, arrived. McAllister spoke with the deputies, who related their versions of what happened. McAllister noted that Fisher had bite marks on his hand while Shroy had a cut lip. The trooper attempted to ask Mrs. Shoop to leave, and when she refused, McAllister placed her under arrest, charging her with assault and resisting arrest. Another struggle ensued between Suzette Shoop and Brenda Webster and the deputies, and they too were arrested. McAllister then drove plaintiffs to Troop H headquarters, where their arrests were processed.

Plaintiffs Evelyn Shoop and Brenda Webster complained of pain resulting from the struggles which took place at the fire hall. They were eventually taken to a hospital and examined.

The three plaintiffs filed this suit pursuant to 42 U.S.C. § 1983, claiming that their constitutional rights were violated because they were arrested without probable cause and the officers involved used unnecessary force to arrest them. Webster and Mrs. Shoop further claim that they were unconstitutionally denied medical care while in the custody of the state police. All three plaintiffs filed pendent state law claims.

After the close of discovery, defendants have filed their motions for partial summary judgment.

*Discussion*

The standards for the award of summary judgment under Federal Rule of Civil Procedure 56 are well known. As the Third Circuit Court of Appeals recently capsulized:

Summary judgment may be entered if "the pleadings, deposition[s], answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). An issue is "genuine" only if the evidence is such that a reasonable jury could return a

verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *Equimark Comm. Finance Co. v. C.I.T. Financial Serv. Corp.*, 812 F.2d 141, 144 (3d Cir.1987). If evidence is "merely colorable" or "not significantly probative" summary judgment may be granted. *Anderson*, 106 S.Ct. at 2511; *Equimark*, 812 F.2d at 144. Where the record, taken as a whole, could not "lead a rational trier of fact to find for the nonmoving party, summary judgment is proper." *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). *Hankins v. Temple Univ.*, 829 F.2d 437, 440 (3d Cir.1987). Once the moving party has shown that there is an absence of evidence to support the claims of the nonmoving party, the nonmoving party may not simply sit back and rest on the allegations in his complaint, but instead must "go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). The court will consider the parties' motions under these standards.

## I. Defendant McAllister

### A. *Failure to Provide Adequate Medical Care*

■ McAllister asserts that plaintiffs have shown no facts from which, as a matter of law, one could conclude that McAllister violated Webster's and Evelyn Shoop's rights to adequate medical care under the due process clause of the fourteenth amendment. Plaintiffs respond essentially by stating that adequate care was not given.

■ To state a claim under § 1983 for the failure to provide adequate medical care to one in pretrial detention, the behavior of the officer must rise to the level of deliberate indifference to a serious medical need. *Dayton v. Sapp*, 668 F.Supp. 385, 388 (D.Del.1987) (citing *Estelle v. Gamble*, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976)); *Boring v. Kozakiewicz*, 833 F.2d 468, 471–473 (3d Cir.1987) (discussing, without resolving, the difference in the "deliberate indifference" standard as applied to pretrial detainees and convicted prisoners), *cert. denied*, 485 U.S. 991, 108 S.Ct. 1298, 99 L.Ed.2d 508 (1988). Here, even adopting plaintiffs' own characterizations, the court cannot say that Webster's and Shoop's medical needs were serious, or that Trooper McAllister was "indifferent" to them.

■ First, unless a medical condition is obviously "serious" to the layman, a plaintiff must submit expert testimony as to the seriousness of the problem. *Boring*, 833 F.2d at 473–74. Plaintiff Webster stated that her "back is what she went to the hospital for because that is what hurted [sic] at the time." Deposition of Brenda Webster at 25. Webster sustained no broken bones, *id.* at 28, and her deposition discloses no type of injury that would be obvious to a layman. Further, she was treated and released from the emergency room of Community General Osteopathic Hospital, a fact which tends to show that her injuries were not "serious." *Id.* at 28–29. Webster has offered no expert testimony or opinions which would prove that, after her arrest, her injuries were, if not obvious to a layman, nevertheless serious to a degree that immediate medical attention was required.

Similarly, Evelyn Shoop's injuries are not of such an obviously serious nature as to have required more speedy medical attention than that which was administered. Mrs. Shoop admits that black and blue bruises did not appear until several days after her arrest. Deposition of Evelyn Shoop at 30–31. Her shoulder and wrists hurt and she was evidently diagnosed as having a mild concussion. However, these are not the types of injuries obvious to a layman as requiring immediate medical attention absent some other outward indicia, such as nausea or disorientation. Plaintiffs do not point out any such manifestations, and the court's own search of the record could find none. Moreover, like

Webster, Mrs. Shoop has submitted no expert opinion showing that her condition at the time directly after the arrest was "serious."

Second, there is no evidence that McAllister was "deliberately indifferent" to a medical need. Though, while being processed at state police headquarters, Evelyn Shoop and Webster evidently complained of soreness in their wrists and were, as a result not fingerprinted, Deposition of Ralph McAllister at 19–20, Webster did not state that she told McAllister that her back hurt or that she wanted to go to the hospital because of pain in her back. Webster Deposition at 25. She did, however, complain of pain in the presence of two other troopers, but could not say that it was because of these complaints that she was taken to the hospital. *Id.* at 26. Plaintiffs present no evidence that these officers informed McAllister that Webster was in pain. Thus, it is not at all apparent that Webster ever made clear to defendant McAllister that she needed treatment.

Moreover, both Webster and Mrs. Shoop were indeed taken to the hospital, and both were treated. Evelyn Shoop estimated that the time between their arrival at state police headquarters and their departure for the hospital was "probably an hour." Evelyn Shoop Deposition at 143. She thought that the ride from the fire hall to the station took perhaps 45 minutes. *Id.* at 193. Therefore, at the most, plaintiffs Webster and Mrs. Shoop were deprived of medical attention for an hour and 45 minutes, a not unreasonable period considering the non-obvious nature of plaintiffs' injuries.

Consequently, Webster and Evelyn Shoop due process rights under the fourteenth amendment were not violated by the wait for medical care, as they have established neither a "serious condition" nor a "deliberate indifference" to such a condition by defendant McAllister.

### B. *Qualified Immunity*

Defendant McAllister asserts that he is entitled to qualified immunity against any liability which may accrue to him for arresting plaintiffs without probable cause and without a warrant.

Courts have granted public officials performing discretionary functions qualified immunity from civil liability "insofar as their conduct does not violate clearly established statutory or constitutional rights which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). Here, the question is not whether McAllister actually had probable cause to arrest plaintiffs, but whether his belief that he had probable cause was objectively reasonable in light of the circumstances at the time of the arrest and that his conduct did not violate any clearly established laws. *Anderson v. Creighton*, 483 U.S. 635, 641, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987).

 Although the court believes that McAllister, through his conversations with the other officers in attendance and corroborating physical evidence, did reasonably believe that he had probable cause to arrest Mrs. Shoop, the court also believes that McAllister should have obtained a warrant to arrest Mrs. Shoop. Pennsylvania law requires that officers secure a warrant to arrest a suspect absent the existence of clearly defined exigent circumstances. For instance, an officer may arrest a suspected felon in a public place without a warrant, *see United States v. Watson*, 423 U.S. 411, 96 S.Ct. 820, 46 L.Ed.2d 598 (1976), or an officer may arrest a person on a misdemeanor charge when he observes the misdemeanor. *See Cambist Films, Inc. v. Duggan*, 475 F.2d 887 (3d Cir.1973). McAllister's arrest of Mrs. Shoop fits into neither of these exceptions, as he personally did not witness her fight with the deputies and the charges on which he argued that he had probable cause—assault and resisting arrest—are misdemeanors in Pennsylvania. *See* 18 Pa.Cons.Stat.Ann. § 2702(a)(3) and (b) and § 5104 (Purdon 1983).[1] Therefore, McAllister should have

---

**1.** The court notes that Mrs. Shoop was also charged under 18 Pa.Cons.Stat.Ann.

§ 2702(a)(1) and (2) (Purdon's 1983), which requires the person to have inflicted, or attempted

procured a warrant before arresting Mrs. Shoop, and since he did not, he is not within the protections of qualified immunity with regard to the arrest of Mrs. Shoop.

The situations of Brenda Webster and Suzette Shoop present a different problem with regard to McAllister's objective assessments of probable cause. McAllister asserts, and other witnesses in depositions have corroborated, that Suzette Shoop and Webster physically attacked sheriff's deputies as they placed Evelyn Shoop in the state police car.[2] In their statement of material facts, plaintiffs deny that Suzette and Webster did this, and further state that "[t]he other Plaintiffs (Suzette and Webster) were attempting to prevent Mrs. Shoop from being beaten by the police."

As stated earlier in this memorandum, a party opposing a summary judgment motion may not merely rest on pleadings or denials in attempting to defeat the motion. *See* Fed.R.Civ.P. 56(e). The nonmoving party must go beyond the pleadings to submit contrary evidence pursuant to rule 56(c) of the Federal Rules of Civil Procedure in order to create a material issue of fact. *See Celotex v. Catrett*, 477 U.S. 317, 322–24, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). In opposing this motion, plaintiffs have not directed the court to affidavits, deposition testimony, interrogatories or admissions on file which would dispute McAllister's assertion that Suzette Shoop and Brenda Webster had attacked the deputies.

However, the court has, through its own review of the record, uncovered statements by Suzette in her deposition denying that she ever physically assaulted any officers that day. Deposition of Suzette Shoop at 103. While, as far as the court can determine, it was not plaintiffs who submitted the deposition transcript to the court, it would defeat the purpose of summary

judgment—to "isolate and dispose of factually unsupported claims or defenses," *Celotex*, 477 U.S. at 323–24, 106 S.Ct. at 2553—to grant summary judgment with regard to Suzette Shoop only because the denial of McAllister's factual assertion was not properly submitted to the court by her attorneys.

 The court, however, could find no version of the facts proferred by Webster which contradicts McAllister's with regard to the events leading to her arrest for assault and resisting arrest. Therefore, the court finds that, given the facts before it, McAllister could reasonably have believed that he had probable cause to arrest Brenda Webster due to her attack of the deputies in his presence. Thus, he is protected from civil liability on the § 1983 claim arising from her allegedly illegal arrest. With regard to Suzette Shoop, her deposition raises a material issue of fact relating to whether she attacked the deputies, and summary judgment is thus not appropriate on the issue of qualified immunity.

### C. *Immunity Against State Claims*

 Defendant McAllister argues that he is statutorily immune from suit with regard to plaintiffs' pendent state law claims of false imprisonment, assault and battery, malicious abuse of legal process and intentional infliction of emotional distress.

The Pennsylvania General Assembly, after the judicial abolition of sovereign immunity by the Pennsylvania Supreme Court in *Mayle v. Pennsylvania Dep't of Highways*, 479 Pa. 384, 388 A.2d 709 (1978), reaffirmed by statute the concept of immunity for the Commonwealth and its employees. The statute, which permits but a few

---

to inflict, "serious bodily harm" on a police officer or other person. Violation of these sections constitutes a felony. Without delving into whether a deputy sheriff is a "police officer" for the purpose of subsection (a)(2), the court feels that, given the relatively minor nature of the deputies injuries, the size differential between them and Mrs. Shoop, and the fact that Mrs. Shoop had no weapon, McAllister could not

seriously believe that the deputies suffered "serious bodily harm."

2. Note that McAllister states that he actually saw these actions firsthand, and is therefore within one of the exigent circumstances for a warrantless arrest.

narrow exceptions to the rule of immunity, reads:

> Pursuant to section 11 of Article I of the Constitution of Pennsylvania, it is hereby declared to be the intent of the General Assembly that the Commonwealth, and its officials and employees acting within the scope of their duties, shall continue to enjoy sovereign and official immunity and remain immune from suit except as the General Assembly shall specifically waive the immunity. When the General Assembly specifically waives sovereign immunity, a claim against the Commonwealth and its officials and employees shall be brought only in such manner and in such courts and in such cases as directed by the provisions of Title 42 ... unless otherwise specifically authorized by statute.

1 Pa.Cons.Stat.Ann. § 2310 (Purdon Supp. 1990). According to the clear language of the statute, not only the Commonwealth but also its employees and officials are entitled to immunity. "In other words, if the Commonwealth is entitled to sovereign immunity under Act 152, then its officials and employees acting within the scope of their duties are likewise immune." *Moore v. Commonwealth*, 114 Pa.Commw. 56, 538 A.2d 111, 115 (1988), *appeal dismissed sub nom. Moore v. Reid*, 523 Pa. 418, 567 A.2d 1040 (1990).

The General Assembly has provided in a different section nine enumerated, exclusive exceptions to this general grant of immunity. The exceptions are for negligent acts involving: 1) the operation of a motor vehicle in the control or possession of a Commonwealth party; 2) health care employees; 3) care, custody or control of personal property; 4) Commonwealth-owned property; 5) potholes or other dangerous conditions; 6) care, custody or control of animals; 7) liquor store sales; 8) National Guard activities; and 9) toxoids and vaccines. 42 Pa.Cons.Stat.Ann. § 8522 (Purdon 1982).

Here, there appears no doubt that Trooper McAllister was acting within the scope of his duties as a state police officer—an employee of the state. *See Lynch v. Johnston*, 76 Pa.Commw. 8, 463 A.2d 87, 90 (1983) ("[I]t goes without saying that state

police are authorized to make arrests."). Indeed, immunity has been previously upheld for Commonwealth law enforcement officers by the courts of the state. *See, e.g., Lynch; Borosky v. Commonwealth*, 46 Pa.Commw. 252, 406 A.2d 256 (1979) (immunity upheld against claim versus Commonwealth for alleged false arrest by state troopers). Moreover, none of the § 8522 exceptions applies to the circumstances submitted to the court.

Plaintiffs appear to argue that since they are alleging the commission of intentional torts by McAllister that the statutory immunity does not apply. This is not the correct conclusion. In *Yakowicz v. McDermott*, 120 Pa.Commw. 479, 548 A.2d 1330 (1988), *appeal denied*, 523 Pa. 644, 565 A.2d 1168 (1989), the Commonwealth Court of Pennsylvania considered whether, in a defamation action against a state employee, immunity does not apply because of the intentional nature of the tort. The court specifically distinguished the immunity for an employee of the Commonwealth versus the immunity conferred by statute upon the employee of a municipality:

> We note that the immunity defense provided by the General Assembly to local agencies and their employees in 42 Pa. C.S. §§ 8541–8564 is lost to local agency employees where their actions which cause injury constitute a "crime, actual fraud, actual malice or willful misconduct." 42 Pa.C.S. § 8550. This would permit a defamation action based on malicious publication to be brought against a local agency employee.... The General Assembly has *not* included any such abrogation of the immunity provided to Commonwealth agency employees.

*Yakowicz*, 548 A.2d at 1334 n. 5. Thus, despite the fact that the torts plaintiffs have pleaded against McAllister require a level intent, McAllister is still within the umbrella of immunity provided by the statute.

II. Defendants Dauphin County, Shroy, and Fisher

 A. *Legality of Arrest/Qualified Immunity*

Like McAllister, defendants Shroy and Fisher argue that plaintiffs' § 1983 claims

against them, insofar as they allege an arrest without a warrant or probable cause, are ripe for summary judgment because the uncontroverted record shows either that they did have probable cause to arrest plaintiffs or that they are protected by qualified immunity.[3] The court will consider these two issues together, as both center on events either leading to the formation of actual probable cause for the deputies or the reasonable belief that they had probable cause.

An important preliminary point is that the briefs of both sides appear to lump the arrests of all of the plaintiffs together for the purposes of the determination of probable cause or the reasonable belief of probable cause. This creates some confusion, as there are essential differences between the circumstances surrounding the arrests of Evelyn Shoop and those of Brenda Webster and Suzette Shoop. The deputies were allegedly sent to remove Evelyn Shoop from the polling place, and then attempted to arrest her when she did not comply. Later, she was placed under arrest and processed by the state police through Trooper McAllister on charges of obstructing the administration of a governmental function, assault and resisting arrest. Brenda Webster was not the subject of any court order, but was apparently handcuffed and placed in the deputies' squad car when she allegedly became disruptive upon the deputies' first try at arresting Mrs. Shoop. Later, she returned to the polls, and was arrested after she allegedly physically attacked sheriff's deputies when they and other officers were arresting Mrs. Shoop a second time. Webster was processed by the state police on assault and resisting arrest charges. Suzette Shoop was apparently arrested only for allegedly attacking, along with Webster, officers as Mrs. Shoop was being placed in the state police car.

■ With regard to Mrs. Shoop's arrest, the facts which are established without contradiction do not establish probable cause or reasonable belief in probable cause on the part of the deputies sufficient to award qualified immunity for the arrest.

Shroy and Fisher assert that they were dispatched to the polling place pursuant to an oral order given by Judge Dowling. When the deputies arrived, they spoke only to Deputy Hallman and Judith Vallier. Hallman had been stationed at the fire hall throughout the morning and had evidently seen no disturbances sufficient to remove any parties. Deposition of James Hallman at 23–36. Vallier's parents were the parties who had complained to Judge Dowling in the first place. Fisher then apparently called the Sheriff's Department twice. The first order he received from headquarters directed him and Shroy to remove Mrs. Shoop; the second reconfirmed the first. They subsequently attempted to arrest Mrs. Shoop, and a scuffle, the facts of which are in dispute, erupted.

These facts are not sufficient to establish probable cause or even the reasonable belief that probable cause existed. First, the scope of Judge Dowling's original order is still in dispute, and needs to be resolved by a finder of fact. Even according to defendants' version of the facts, however, the deputies were sent to the polls to "ascertain whether there was a disturbance," not strictly to remove Mrs. Shoop. Brief of Defendants Dauphin County, *et al.* in Support of Motion for Partial Summary Judgment at 6. This court is not prepared to hold, as Dauphin defendants urge, that an oral "order" of court, passed on to an officer through another officer back at the station, is the equivalent of an arrest warrant issued by a neutral judge after viewing affidavits and the like to determine probable cause. In ascertaining the situation at the polls, Shroy and Fisher spoke to only two individuals, a deputy who had not seen fit to intervene himself and Judith Vallier, who had a definite interest and a possible bias in seeing Mrs. Shoop removed. Importantly, there were many other witnesses handy, including Roberta Karper, who has stated that Mrs. Shoop was not disruptive. Deposition of Roberta Karper at 12–23. That the deputies later received orders, supposedly from Judge Dowling, to remove Mrs. Shoop becomes

---

**3.** *See supra* p. 1332 for a discussion of the standards for qualified immunity.

almost irrelevant because any order would be based on Shroy and Fisher's inadequate assessment of the situation at the polls. *See Be Vier v. Hucal*, 806 F.2d 123 (7th Cir.1986) (state trooper's assessment of probable cause for child neglect, when he engaged in no investigation other than his immediate assessment of the scene, was both wrong and unreasonable). Moreover, at the time the deputies arrived at the fire hall, things appeared to be fairly calm, and thus they had no real immediate need to escort Mrs. Shoop from the polls.

■■■■■ The arrests of Brenda Webster and Suzette Shoop present a different set of facts for the consideration of probable cause or qualified immunity. As the court understands it, these two were arrested for attacking officers attempting to arrest Mrs. Shoop. The same reasoning which applies to the determination of probable cause to arrest these two plaintiffs by Trooper McAllister, *see supra* pp. 10–12, applies to plaintiffs here. A material issue of fact is created by the testimony of Suzette Shoop; Brenda Webster fails to go beyond the pleadings as required by Federal Rule of Civil Procedure 56(e). Therefore, summary judgment will be granted as to Shroy and Fisher's immunity from Webster's claim for illegal arrest. As a material issue of fact exists with regard to Suzette's claims, immunity may not be granted through summary judgment.

### B. *Liability of Dauphin County Under § 1983*

■■■■ Defendant Dauphin County cannot be held liable in a § 1983 action solely on the basis of *respondeat superior. Monell v. Department of Social Servs.*, 436 U.S. 658, 691–95, 98 S.Ct. 2018, 2036–38, 56 L.Ed.2d 611 (1978). A municipal body such as the county is subject to liability only if the allegedly unconstitutional acts either "implement[ ] or execute[ ] a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers" or is "visited pursuant to governmental 'custom' even though such a custom has not received formal approval through the body's official decisionmaking channels." *Id.* at 690–91, 98 S.Ct. at 2035–36.

Even if a policy is not formally established its existence for the purpose of § 1983 liability may be inferred "from informal acts or omissions of supervisory municipal officials." *Estate of Bailey by Oare v. County of York*, 768 F.2d 503, 506 (3d Cir.1985) (citation omitted). The conduct of a single low level officer may not establish an "official policy." *Oklahoma City v. Tuttle*, 471 U.S. 808, 821–24, 105 S.Ct. 2427, 2435–37, 85 L.Ed.2d 791 (plurality opinion) (1985).

In the present case, plaintiffs base their claims for municipal liability on allegations that the Sheriff's Department failed to supervise and discipline deputies and failed to give them proper training, resulting in the creation of a policy of encouraging constitutional violations by deputies.

■■■ The failure to supervise and discipline allegations do not support a cause of action. The Third Circuit has narrowly circumscribed the situations where supervisory approval of unconstitutional conduct may lead to liability on the part of a municipality, suggests that, at a minimum, liability vests only where the official has " '1) contemporaneous knowledge of the offending incident or knowledge of a prior pattern of similar incidents, and 2) circumstances under which the supervisor's inaction could be found to have communicated a message of approval to the offending subordinate.' " *Colburn v. Upper Darby Township*, 838 F.2d 663, 673 (3d Cir.1988) (quoting *Chinchello v. Fenton*, 805 F.2d 126, 133 (3d Cir.1986)). Plaintiffs do not appear to argue that there was a continuing pattern of violations by the Sheriff's Department, and has offered no evidence to that effect. Therefore, plaintiff may not pursue § 1983 claim based on this theory.

Dauphin County also argues that plaintiffs' theory of inadequate training similarly fails to establish the potential liability of the County for the actions of the deputies. The county cites *Krisko v. Oswald*, 655 F.Supp. 147, 152 (E.D.Pa.1988) and *Colburn*, 838 F.2d at 673 as standing for the proposition that a municipality may not be

held liable for a constitutional violation for failure to train employees. In *Colburn,* however, the Third Circuit specifically stated that it did mean to "suggest that there are no circumstances in which a deficient training policy can form the basis for municipal liability under section 1983," and cited the opinion of four Supreme Court justices who voted not to dismiss the writ of certiorari in a case where liability of a city had been upheld on the basis of a grossly negligent training policy. *Colburn,* 838 F.2d at 672 (citing *City of Springfield v. Kibbe,* 480 U.S. 257, 107 S.Ct. 1114, 94 L.Ed.2d 293 (1987) (O'Connor, J., joined by Rehnquist, C.J., White, J., and Powell, J., dissenting from dismissal of writ of certiorari to *Kibbe v. City of Springfield,* 777 F.2d 801 (1st Cir.1985)).

▆▆ Here, the court believes that plaintiffs have produced sufficient evidence to at least create a factual question as to whether the County and the Sheriff's Department was grossly negligent in the training of its deputies sufficient to establish § 1983 liability. Sheriff William Livingston has testified in his deposition that there is no specific written internal plan or procedure for training deputies such as Shroy and Fisher, and that deputies are not given any legal training. Deputies are not trained in how to restrain people. Their investigative training is evidently limited to referring questions to the county solicitor. Part time deputies receive on the job training. Livingston did state, however, that full time deputies attend a four week course pursuant to the Deputy Sheriff's Training Act, and newer deputies are paired with veterans as part of their initial training. *See* Deposition of William Livingston at 13–20. Therefore, summary judgment is not appropriate on this issue.

### C. *Intentional Infliction of Emotional Distress*

▆▆ The Dauphin defendants also argue that they are due summary judgment on plaintiffs' state law intentional infliction

of emotional distress claim. In its memorandum of April 11, 1990, this court stated that it believed that the Commonwealth of Pennsylvania recognized the tort of intentional infliction of emotional distress, but that required that plaintiffs submit competent medical evidence that the emotional distress exists to support a claim under the tort.

Plaintiffs have submitted no such evidence. The only submission even approximating "competent medical evidence" is a brief letter by a physician to Suzette Shoop stating that Suzette had a skin rash and was prescribed a cortisone cream. There is no discussion of emotional distress causing the condition. This letter does not satisfy the law of Pennsylvania or the April 11, 1990 order of this court. Accordingly, Dauphin defendants' motion for summary judgment on this issue will be granted.[4]

### D. *Malicious Prosecution*

▆▆ The county defendants argue that plaintiffs have not presented sufficient evidence to raise a cause of action for plaintiffs' pendent state law claim of malicious prosecution. The Restatement (Second) of Torts defines the tort of "malicious prosecution"—the malicious initiation of criminal proceedings—as such:

> A private person who initiates or procures the institution of criminal proceedings against another who is not guilty of the offense charged is subject to liability for malicious prosecution if
>
> (a) he initiates or procures the proceedings without probable cause and primarily for a purpose other than that of bringing an offender to justice, and
>
> (b) the proceedings have terminated in favor of the accused.

Restatement (Second) of Torts § 653 (1976); *Bruch v. Clark,* 352 Pa.Super. 225, 507 A.2d 854, 856 (1986). Public prosecutors, such as district attorneys, are accorded absolute immunity from liability. Peace officers are not. Restatement (Second) of Torts § 656 comment d (1976).

---

**4.** As defendant McAllister is immune from state tort law claims, the disposition of these state law issues is moot with regard to him.

**1338**

 The Dauphin defendants argue that defendants Shroy and Fisher are not subject to liability for this tort because they were not the officers who issued the complaint. This is too narrow a reading of the term "initiate." Shroy and Fisher were intimately involved with the criminal proceedings against Mrs. Shoop from beginning to end. This is sufficient to say that they "initiated" the proceedings along with others.

■ The county defendants also argue that plaintiffs have not shown a motive other than the administration of justice for the bringing of the prosecution. Indeed, plaintiffs have failed to direct the court to any evidence that the deputies instituted the proceedings for an improper purpose. However, the Restatement indicates that the initiation of prosecution without probable cause is evidence that there was an improper purpose behind the prosecution. Restatement (Second) of Torts § 669 (1976). *Simpson v. Montgomery Ward & Co.*, 165 Pa.Super. 408, 68 A.2d 442, 446 (1949). Pennsylvania courts have softened the probable cause standard in such a situation to whether "the facts and circumstances convince the defendant 'as a reasonable, honest and intelligent human being, that the suspected person is guilty of a criminal offense.'" *Bruch*, 507 A.2d at 857 (quoting *Neczypor v. Jacobs*, 403 Pa. 303, 169 A.2d 528, 531 (1961)). Here, the court has previously found in this memorandum that Shroy and Fisher lacked a reasonable basis for believing that they had probable cause to arrest Mrs. Shoop in the context of qualified immunity. *See supra* pp. 1335–1336. Therefore, although the lack of probable cause offers only slight, inferential evidence, the court feels it is enough to make the existence of illegitimate purpose behind the prosecution of Mrs. Shoop an issue for the jury with regard to the two deputies.

Note that this portion of the opinion applies only to Evelyn Shoop. With regard to Brenda Webster, the court, as stated earlier in the memorandum, granted summary judgment in favor of defendants as to the issue of the existence of probable cause for her arrest. For Suzette Shoop, in whose case a material issue of fact exists, she may still state a claim for malicious prosecution if it is found by the fact finder that she had not attacked the officers and the officers had not probable cause to arrest her. Therefore, the court will grant the summary judgment motion as it applies to Brenda Webster on this issue of malicious prosecution, but not as to Evelyn and Suzette Shoop.