# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Lewis Campbell, III,           :
        Appellant        :
                       :
     v.               :  No. 1420 C.D. 2017
                       :  ARGUED:  May 8, 2018
California University of Pennsylvania :
and Dr. Karen Hjerpe        :


BEFORE:    HONORABLE P. KEVIN BROBSON, Judge
               HONORABLE ELLEN CEISLER, Judge
               HONORABLE DAN PELLEGRINI, Senior Judge

OPINION NOT REPORTED

MEMORANDUM OPINION
BY JUDGE CEISLER                       FILED:  June 1, 2018


Appellant Lewis Campbell, III (Appellant) appeals from a "memorandum order" issued by the Court of Common Pleas of Washington County (Trial Court) on August 25, 2017, which sustained Appellees California University of Pennsylvania and Dr. Karen Hjerpe's (University and Dr. Hjerpe, individually, and Appellees, collectively) Preliminary Objections to Appellant's First Amended Complaint, and consequently dismissed the negligence and "institutional negligence"-based civil action Appellant had instituted against them, on sovereign immunity grounds. We affirm.

The facts underlying this action are as follows:

Appellant and Shareese Asparagus, a University student who was Appellant's girlfriend, were walking near an off-campus bar/restaurant during the early morning hours on October 30, 2014, when they encountered a group of six University football

players.[1] First Amended Complaint at 2-3. One of the players, Corey Ford, made a crude comment to Ms. Asparagus, prompting Appellant to exchange words with Ford. *Id.* at 3. Ford then punched Appellant in the face knocking him to the ground, at which point the other players surrounded Appellant and delivered a savage beating that rendered Appellant unconscious and left him with severe mental and physical injuries, the effects of which still persistently affect Appellant. *Id.* at 3-4. Ford eventually pled no contest to aggravated assault and was sentenced to between 21 and 23 months in jail, while 4 of the remaining 5 players pled guilty to simple assault and were each given 18 months of probation.[2] *Id.* at 5. The University responded to this extremely disturbing attack by cancelling that weekend's football game and hiring an outside organization, The Compliance Group, to study the University's football team and make remedial recommendations regarding the institutional and football cultures at the University. *Id.* at 6.

On October 25, 2016, Appellant filed a Writ of Summons naming the University and Dr. Hjerpe, the University's athletic director, as defendants. Appellant docketed his Complaint on January 3, 2017, and his First Amended Complaint on February 24, 2017. Appellant's Amended Brief at 5. Therein, Appellant claimed that the University was so focused on having a dominant and successful football team that it had "engaged in high-risk football recruiting practices" including bringing in players with criminal records and other "behavioral issues[,]" failing to properly monitor the players' off-field conduct, and neglecting

---

[1] Appellant does not claim that he was ever a University student; rather, he argues that he was a "member of the [University] community as he was staying at [t]he University with his girlfriend, Ms. Asparagus[.]" First Amended Complaint at 11.

[2] All charges were dropped against the sixth player, as he had not physically attacked Appellant during the October 30, 2014 altercation. First Amended Complaint at 3, 5.

2

to appropriately or consistently discipline players when they violated University policies, committed criminal infractions, or both. First Amended Complaint at 7-12. Consequently, Appellant argued that the University and Dr. Hjerpe, who "overs[aw] and [was] responsible for the University's Athletic Department[,]" had negligently breached their duties to him by introducing violent individuals into the University community, and, by giving these players various forms of special treatment, they "created and fostered a negative and dangerous football culture[.]" *Id.* at 7-34. Appellant maintained that these acts and omissions led to the October 30, 2014 altercation and that Appellees were thus liable for the various types of harm he had suffered as a result of being severely beaten. *Id.* at 12-35.

Appellees responded by filing Preliminary Objections, stating that Appellant's suit should be dismissed in its entirety because he had neither pled a viable cause of action nor articulated a claim that fell within one of the exceptions to sovereign immunity authorized pursuant to Section 8222 of the Sovereign Immunity Act, 42 Pa. C.S. §8522. Preliminary Objections at 1-4. In opposition, Appellant argued that he had indeed put forth cognizable claims against Appellees, and that sovereign immunity did not attach in this matter because establishing and maintaining athletic programs were not powers provided by, or acts in furtherance of, the University's "enabling legislation[.]" Brief in Support of Appellant's Answer to Appellees' Preliminary Objections at 5-11. On August 25, 2017, the Trial Court sustained the Preliminary Objections on the basis of sovereign immunity and dismissed Appellant's action. Tr. Ct. Memorandum Order at 1-4. This appeal followed.

Appellant maintains that the Trial Court erred in sustaining Appellees' Preliminary Objections on sovereign immunity grounds because, in essence, he

3

believes sovereign immunity does not apply in this situation. Appellant supports this claim by noting that the University is not explicitly authorized by statute to establish and maintain athletics programs. Appellant relies heavily on *Garrettson v. Commonwealth*, 405 A.2d 1146 (Pa. Cmwlth. 1979), which he argues stands for the proposition that "a state agencies [sic] action is not subject to sovereign immunity protection if the action is outside the authorization of its enabling legislation." Appellant's Amended Brief at 12-17; *see also* Section 2003-A of the Public School Code of 1949, Act of March 10, 1949, P.L. 30, *as amended*, 24 P.S. § 20-2003-A, *added by* the Act of November 12, 1982, P.L. 660.[3] Thus, according to Appellant,

---

[3]   (a) The State System of Higher Education shall be part of the Commonwealth's system of higher education. Its purpose shall be to provide high quality education at the lowest possible cost to the students. The primary mission of the system is the provision of instruction for undergraduate and graduate students to and beyond the master's degree in the liberal arts and sciences and in applied fields, including the teaching profession. Graduate instruction at the doctoral level, except for doctoral programs provided for in the act of December 16, 1965 (P.L. 1113, No. 430), known as the "Indiana University of Pennsylvania Act," only may be offered jointly with Indiana University or an institution chartered to offer work at the doctoral level. Programs of research and service may be provided which are approved by the Board of Governors, and which are consistent with the primary mission of the system. Each institution shall provide appropriate educational facilities, student living facilities and such other facilities as deemed necessary by the board.

(b) The system is hereby granted and shall have and may exercise all the powers necessary or convenient for the carrying out of the aforesaid purposes, including, but without limiting the generality of the foregoing, the following rights and powers:

(1) To have perpetual existence as a corporation.

(2) To adopt, use and alter at will a corporate seal.

(3) To acquire, purchase, hold, lease as lessee and use any property, real, personal or mixed, tangible or intangible, or any interest therein, lease as lessor any property, real, personal or mixed,

4

the University is not protected by sovereign immunity in this particular situation, as the University's acts and omissions pertaining to the football team were neither in furtherance of the University's statutorily defined mission, nor an exercise of its

tangible or intangible, necessary or desirable for carrying out the purposes of the system, and to sell, transfer and dispose of any property acquired by gift, grant, devise or bequest, whether the property is real, personal or mixed, tangible or intangible, or any interest therein; to take, demand, receive and possess all moneys, real property and goods which shall be appropriated, given or granted to for the use of the system and to apply the same according to the will of the donors; to sell, transfer and dispose of real property acquired by and titled to the system upon approval by the General Assembly as provided in section 2018-A; and by gift, purchase or devise to receive, possess, enjoy and retain forever any and all real and personal estate and funds, of whatsoever kind, nature or quality the same may be, in special trust and confidence that the same, and the profits thereof, shall be applied to and for the use and purpose of endowing the system, and shall have power to receive donations from any source whatever, to be exclusively devoted to the purposes of the system or according to the terms of donation: Provided, however, That the system shall have no power at any time or in any manner, to pledge the credit or taxing power of the Commonwealth, nor shall any of its obligations or debts be deemed to be obligations of the Commonwealth, nor shall the Commonwealth be liable for the payment of principal or interest on such obligations. Nothing herein shall empower the Board of Governors or the chancellor to take or receive any moneys, goods or other property, real or personal, which is given or granted to specific institutions.

(c) Collective bargaining agreements in force at the time of enactment of this act shall remain in force for the term of the contract. New collective bargaining agreements with professional employes shall be negotiated on behalf of the system by the chancellor. The board shall make a coalition bargaining arrangement with the Commonwealth for the negotiation of new collective bargaining agreements with noninstructional employes.

(d) The system may enter into an agreement with any entity for the cooperative use of supplies or services. All purchases and agreements made pursuant to this subsection shall be the result of a system of competitive bidding and in accordance with the laws of this Commonwealth.

5

statutorily defined powers. Appellant's Amended Brief at 12-17. Appellant extrapolates from this point to conclude that Dr. Hjerpe cannot avail herself of sovereign immunity either, because her responsibilities as the University's athletic director, including recruiting and supervising members of the University's football team, "[did] not further the purpose of providing a quality education at a cost students can afford . . . [or] the core values of integrity, civility and responsibility . . . student achievement and success, institutional excellence, and community service." *Id.* at 17-21. Thus, Appellant opines that sovereign immunity does not attach to Dr. Hjerpe because her duties were neither derived from, nor supported by, the University's legislatively defined mission. *Id.*

> Our review of a trial court's order sustaining preliminary objections in the nature of a demurrer is to determine whether the trial court abused its discretion or committed an error of law. . . . Preliminary objections in the nature of a demurrer should be sustained only where the pleadings are clearly insufficient to establish a right to relief. Any doubt must be resolved in favor of overruling the demurrer.

*Jacobs v. Merrymead Farm, Inc.*, 799 A.2d 980, 983 (Pa. Cmwlth. 2002) (internal citations omitted). Normally, a party is prohibited from invoking sovereign immunity through preliminary objections, and must instead introduce it as an affirmative defense in its answer with new matter. Pa.R.C.P. No. 1030(a) ("Except as provided by subdivision (b), all affirmative defenses including but not limited to the defenses of . . . immunity from suit . . . shall be pleaded in a responsive pleading under the heading 'New Matter'."). However, there is an exception to this rule, through which a court may address an improperly raised sovereign immunity defense where its propriety is facially apparent and the opposing party does not object to the procedural defect. *Jacobs*, 799 A.2d at 983. Since Appellant never

6

challenged Appellees' decision to raise sovereign immunity at the preliminary objection stage, we may move on to assessing the applicability of this defense in this matter.

Sovereign immunity exists by virtue of article I, section 11 of the Pennsylvania Constitution, which states, in pertinent part, "[s]uits may be brought against the Commonwealth in such a manner, in such courts and in such cases as the Legislature may by law direct." Pa. Const. art. I, § 11. This provision is supplemented by statutory language, which declares "that the Commonwealth, and its officials and employees acting within the scope of their duties, shall continue to enjoy sovereign immunity and official immunity and remain immune from suit except as the General Assembly shall specifically waive the immunity." 1 Pa. C.S. §2310. The General Assembly has seen fit to waive sovereign immunity in limited situations emanating from nine different classes of acts or omissions.[4]

Here, Appellant acknowledges that the "University and Dr. Hjerpe[,] as a member of the Pennsylvania State System of Higher Education and its employee[ ], respectively[,] are generally covered by sovereign immunity." Appellant's Brief at 14. In addition, Appellant does not argue that Appellees' allegedly tortious behavior fits any of the aforementioned statutory exceptions to sovereign immunity. *Id.* Instead, for the reasons we have previously noted, Appellant maintains that sovereign immunity is *inapplicable* to the current scenario. This belief, however, reflects a misunderstanding on Appellant's part as to the breadth and scope of

---

[4] These categories are vehicle liability; medical-professional liability; care, custody or control of personal property; Commonwealth real estate, highways and sidewalks; potholes and other dangerous conditions; care, custody or control of animals; liquor store sales; National Guard activities; and toxoids and vaccines. 42 Pa. C.S. § 8522(b).

sovereign immunity in this Commonwealth. Appellant's rather confusing anti-sovereign immunity argument appears to hinge almost entirely upon a fleeting reference in the *Garrettson* opinion to sovereign immunity in the context of Commonwealth entities performing "governmental" or "proprietary" functions.[5]

In *Garrettson*, the plaintiff sued the Commonwealth of Pennsylvania and the Pennsylvania Liquor Control Board (Board), as well as two private entities, "[seeking] an injunction to prevent [them] from distributing a State Liquor Store price list with [his] picture on the cover and compensatory and punitive damages for injury caused [to him] by distribution of the list." 405 A.2d at 1147. Attempting to steer around the Board and the Commonwealth's sovereign immunity, *Garrettson* argued this defense was inapplicable "because the Board's use of advertising space on the cover of its liquor price lists is not a governmental, but rather a proprietary act, and therefore, is outside the scope of the Board's protected activities." *Id.* at

---

[5]      It is undoubtedly true as stated by Mr. Justice Linn in *Honaman v. City of Philadelphia*, . . . 185 A. 750, 751 [(Pa. 1936)], that the distinction in the law determining tort liability of municipal corporations arising out of the exercise, on the one hand, of so-called governmental functions, and, on the other, of corporate or proprietary functions, have long been in a state of confusion and uncertainty. Indeed the decisions on this subject have been more or less arbitrary, and not wholly consistent with one another, perhaps because they have been based primarily on practical considerations of public policy rather than on any principles of logic. What at least is firmly established is, that, in the case of acts of municipalities performed as functions of government delegated by the State to its agencies as public instrumentalities, there is immunity from such liability[.]

*Hill v. Hous. Auth. of City of Allentown*, 95 A.2d 519, 520 (Pa. 1953).

"In general, (and perhaps unhelpfully), it has been said that if a given activity is one which a local government unit is not statutorily required to perform, or if it may also be carried on by private enterprise, or if it is used as a means of raising revenue, the function is proprietary." *Morris v. Sch. Dist. of Mt Lebanon Twp.*, 144 A.2d 737, 739 (Pa. 1958), *overruled on other grounds by Ayala v. Philadelphia Bd. of Pub. Ed.*, 305 A.2d 877 (Pa. 1973), and *overruled on other grounds by Mayle v. Pa. Dep't of Highways*, 388 A.2d 709 (Pa. 1978).

1149. We rejected that contention, reviewing the Board's statutory authority and concluding "that choosing the cover design for liquor price lists is included within the [Board's] governmental powers." *Id.* At no point in *Garrettson* did we declare that Commonwealth entities are not shielded by sovereign immunity when executing "proprietary" functions. To the contrary, in other cases, we have made it patently clear that "this State's sovereign immunity is [not] subject to the distinction between governmental and proprietary functions." *Finkelstein v. Shippensburg State Coll.*, 370 A.2d 1259, 1260 (Pa. Cmwlth. 1977). Indeed, "[a]bsent express legislative authorization, *all* suits against the Commonwealth and its agencies are barred by Article I, Section 11 of the Pennsylvania Constitution without regard to the type of function which gives rise to the action." *Poklemba v. Shamokin State Gen. Hosp.*, 344 A.2d 732, 734 (Pa. Cmwlth. 1975) (emphasis in original).

Therefore, in the context of sovereign immunity, it is immaterial that the University is not expressly authorized by statute to establish and maintain athletic programs, such as its football team. Instead, we must analyze this matter by considering the connections between the University and its football team, the University and Dr. Hjerpe, and Dr. Hjerpe and the University's football team. In the instant matter, it is clear that both the University and Dr. Hjerpe are clothed by sovereign immunity's protection in this situation. As Appellant himself admits, the University's football team is necessarily an appendage of the University itself, its roster is filled exclusively by University students, and it is ultimately supervised by Dr. Hjerpe, in her role as the University's athletic director. *See* First Amended Complaint at 6-11. Consequently, as Appellant did not argue that his action fell within one of the statutorily authorized exceptions to this defense, the Trial Court

9

properly sustained Appellees' Preliminary Objections and appropriately dismissed Appellant's lawsuit.[6]

_____
ELLEN CEISLER, Judge

---

[6] In addition to surmounting the bar of sovereign immunity, "[a] plaintiff seeking to impose liability on a Commonwealth party . . . must [also] establish . . . that a common law or statutory cause of action exists against the Commonwealth party as a result of a negligent act of the Commonwealth party[.]" *Donnelly v. Se. Pa. Transp. Auth.*, 708 A.2d 145, 147 (Pa. Cmwlth. 1998). The Trial Court did not address the question of whether Appellant had stated a viable cause of action against the University or Dr. Hjerpe, so we do not consider that issue herein. Even so, we are intensely skeptical as to whether either one could be held liable for off-campus, criminal acts perpetrated by third parties against an individual who was not affiliated with the University.

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Lewis Campbell, III,          :
Appellant                    :
                             :
        v.               :  No. 1420 C.D. 2017
                             :
California University of Pennsylvania :
and Dr. Karen Hjerpe        :

## O R D E R

AND NOW, this 1st day of June, 2018, the "memorandum order" of the Court of Common Pleas of Washington County, dated August 25, 2017, is hereby AFFIRMED.

_____
ELLEN CEISLER, Judge